# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Payne v. Retirement Board of the Firemen's Annuity & Benefit Fund*,
2012 IL App (1st) 112435

| | |
|---|---|
| Appellate Court Caption | DANIEL PAYNE, Plaintiff-Appellant, v. THE RETIREMENT BOARD OF THE FIREMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-11-2435 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | August 14, 2012<br><br>September 12, 2012<br>September 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff firefighter was not entitled to a duty disability pension as a result of a shoulder injury where the record showed he was able to perform the functions of his position as a deputy district chief. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-37382; the Hon. Sophia H. Hall, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Thomas P. Needham, of Law Offices of Thomas P. Needham, of Chicago, for appellant.

Mary Patricia Burns and Vincent D. Pinnelli, both of Burke Burns & Pinelli, Ltd., of Chicago, for appellee.

Panel

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Quinn concurred in the judgment and opinion.
Justice Cunningham specially concurred, with opinion.

**OPINION**

¶ 1     Plaintiff Daniel Payne appeals from a decision rendered by defendant, the Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago (Board), in which the Board denied his application for a duty disability pension. Plaintiff contends that the Board's decision to deny his application for a duty disability pension was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                                   I. BACKGROUND

¶ 3     On May 10, 2009, plaintiff injured his shoulder while falling from a ladder during a Chicago Fire Department (Fire Department) training exercise. Plaintiff was 57 years old at the time of the injury and had been working for the Fire Department since 1975. He was promoted to deputy district chief (DDC) in 2003 and held that position up until his injury.

¶ 4     On the date in question, plaintiff was supervising a training session from a "tower ladder" that was 10 to 12 feet high. During the exercise, the Fire Department received an emergency call. The training stopped and the firemen began to respond to the emergency. Plaintiff was in a hurry to get off the tower ladder and lost his balance on the way down. He tried to hold onto the ladder with his right arm, but dropped to the ground and landed on his back. He sustained an injury to his right shoulder as a result of the fall and was taken to Northwestern Hospital.

¶ 5     As a result of his shoulder injury, plaintiff applied for disability benefits to the Board on April 6, 2010. The Board held a hearing in connection with plaintiff's application on July 21, 2010. The following pertinent facts were adduced at the hearing through exhibits and testimony.

¶ 6     The emergency room notes from the hospital indicate that plaintiff had tenderness at his shoulder and decreased range of motion when he arrived on the day of the incident. His X-ray showed no acute abnormality of the right shoulder, and he was released to go home.

¶ 7     On May 18, 2009, Dr. Bernard Bach, plaintiff's treating physician, saw plaintiff to assess

his right shoulder injury. Plaintiff was complaining of significant pain in his right shoulder while he slept and was unable to elevate his arm over 30 degrees. Dr. Bach ordered an MRI, as he suspected a possible rotator cuff tear. An MRI was performed that day.

¶ 8    The MRI revealed hypoplastic posterior glenoid with fragmentation of the posterior glenoid with maceration of the posterior-superior and posterior glenoid labrum. It was noted that this could be related to recurrent posterior subluxation secondary to glenoid hyperplasia with repetitive trauma, versus a prior direct injury or surgery to the posterior glenoid. The findings were suggestive of a mild subacromion-subdeltoid bursitis. The MRI further showed mild tendinopathy of the supraspinatus and infraspinatus, without rotator cuff tear.

¶ 9    Dr. Bach reviewed plaintiff's MRI and found "no evidence of a complete rotator cuff tear; perhaps a small, partial-thickness tear in the supraspinatus in only one or two of the images." Plaintiff was given a cortisone injection and a prescription for physical therapy. He was told to remain off work.

¶ 10    Plaintiff started physical therapy, which gradually allowed him to elevate his arm to about 120 degrees. Because plaintiff was benefitting from physical therapy, Dr. Bach recommended continuing physical therapy and reminded plaintiff that it could be several months before the pain would be relieved and function restored. He was to remain off work in the meantime.

¶ 11    By July 22, 2009, plaintiff was better able to perform the functions of daily living and was without any pain. Dr. Bach put him on light-duty work at that time, because he felt that "secondary to his position in a supervisory role that if he were involved in a fire [or] that something went wrong, we feel like that he would not be able to do the activities that are required of him even though is job description says that he is only a supervisory role."

¶ 12    Plaintiff received another cortisone injection on September 2, 2009, as he was still complaining of difficulty sleeping on his right side at night and was not able to perform the duties of a firefighter.

¶ 13    Five months after his injury, Dr. Bach noted that plaintiff would benefit from a functional capacity evaluation to determine whether he could go back to work.

¶ 14    The functional capacity evaluation was done on November 2, 2009, which was conducted by Dr. Bradley Perry of Athletico. The exam revealed that plaintiff's job was listed as "fire fighter" at the time of the injury. Dr. Perry noted that as a firefighter for the City of Chicago, it was essential that plaintiff show the ability to work in the "Very Heavy Physical Demand Level," which meant lifting up to 150 pounds. Plaintiff showed the ability to lift in the "Heavy Level" to "Very Heavy Physical Demand Level" for lifting below waist level. He was able to lift up to 138 pounds from a foot above the floor to waist level, and 98 pounds from the floor to waist level. He was able to lift 53 pounds from waist to shoulder, and 48 pounds from shoulder to overhead. Plaintiff was able to carry up to 68 pounds in the "Heavy Physical Demand Level," push 110 pounds in the "Very Heavy Physical Demand Level," and pull 100 pounds in the "Heavy Physical Demand Level." Plaintiff also went through simulation drills where he was able to simulate poking a hole in a roof, carrying a fire hose up stairs, and going up and down a ladder. He did not show any limitations during the simulation except for cardiovascular fatigue.

¶ 15        Dr. Perry determined that at that time, plaintiff was "not capable of meeting critical job demands of his pre-injury job as a Fire Fighter." Dr. Perry then recommended four to six weeks of work conditioning, five times per week, in order to meet Very Heavy Physical Demand Level "needed for safe return to work as a Fire Fighter."

¶ 16        On March 24, 2010, Dr. Bach noted that plaintiff had plateaued in terms of his progress and that he reached a maximum medical improvement. Based on the exam and the results of the functional capacity evaluation, Dr. Bach believed he could be released at that point with permanent restrictions of no lifting or carrying greater than 15 pounds on occasion or 25 pounds frequently and no overhead use of his right arm. Dr. Bach stated in plaintiff's work status note that plaintiff "may return to work with modified restrictions."

¶ 17        On April 6, 2010, plaintiff applied to the Board for disability benefits.

¶ 18        On May 18, 2010, George Motto, M.D., a physician for the Firemen's Annuity and Benefit Fund, wrote a letter to the Board members. Dr. Motto stated that Dr. Bach had not recommended surgery because plaintiff showed continued improvement. Plaintiff told Dr. Motto that under no circumstances would he undergo surgery due to his fears of being put under the care of an anesthesiologist. Dr. Motto suggested the Board obtain an independent medical examiner to look at plaintiff.

¶ 19        On May 25, 2010, Dr. Guido Marra, the director of shoulder and elbow surgery at Loyola University Medical Center, saw plaintiff for an independent examination. Dr. Marra found that plaintiff's diagnosis was a partial thickness rotator cuff tear, and that if the shoulder condition was left as it was, he did not feel that plaintiff would be able to return to work as a firefighter. Dr. Marra based this opinion on the fact that plaintiff had a structural lesion in his rotator cuff. Additionally, the functional capacity evaluation showed that plaintiff's function was below that which would be expected of him as a firefighter. Dr. Marra further found that plaintiff was clearly a candidate for an arthroscopic decompression with evaluation of his rotator cuff condition and possible repair. The anticipated time for recovery from this procedure would be three to four months for a decompression, and four to six months for a rotator cuff repair. The surgery could be performed as an outpatient surgery and carried minimal medical risks. At the completion of recovery, Dr. Marra stated that plaintiff's function would improve and give him a good chance to return to work as a firefighter "as the tear is small."

¶ 20        At the hearing on plaintiff's application for disability benefits, Tedmund Debur, a fireman in the 3rd Battalion who witnessed plaintiff's fall on the date in question, stated that a DDC's job, other than witnessing drills, included administrative duties, responding to fires, and "manpower." A DDC can choose to respond to fires or he or she can be called to respond to fires.

¶ 21        Plaintiff testified that he began his career as a firefighter in 1975, and at the time he was injured, he held the position of DDC. He was promoted to DDC in 2004. Following his shoulder injury, plaintiff underwent physical therapy three days a week for seven or eight months. Then plaintiff participated in a functional capacity evaluation. Dr. Bach told him he did not pass that test, and therefore "Work Hardening" would likely be approved by the Fire Department's insurance carrier. That started right away and consisted of four hours a day,

five days a week, for four weeks.

¶ 22    Plaintiff testified that in his current condition, he had limited range of motion and pain associated with the areas that he could not reach. Anything above chest level was diminished in strength and he had pain associated with it.

¶ 23    Plaintiff testified that as a DDC, one of his roles was to witness training drills like the one that was unfolding on the day of his injury and to make corrections if necessary. He admitted that the role of DDC is a supervisory one.

¶ 24    Plaintiff was then asked to look at a notice of a job opportunity, which was posted by the Fire Department in 2007, for the job of DDC. Plaintiff reviewed the notice and stated that it only encompassed about 60% or 70% of what he is required to do as DDC.

¶ 25    On the day in question, plaintiff stated that he was in a hurry to get off the tower he had been standing on because he was going to respond to the emergency call that came in. He was not required to do so, but had chosen to. As DDC, he could respond to any incident that he cared to respond to, like drownings, suicides, extrications, and fires.

¶ 26    Plaintiff testified that his responsibilities, once he responded to a scene, included organization, logistic strategy, administration, and protection.

¶ 27    Plaintiff further testified that Dr. Bach originally told him that he had a torn rotator cuff. He then went through physical therapy, took a functional capacity evaluation, and then began the work-hardening program. After completing that program, Dr. Bach told plaintiff that he had reached maximum medical improvement.

¶ 28    Plaintiff testified that Dr. Marra never told him that he could have an arthroscopic procedure on his shoulder. Dr. Bach had discussed the procedure in their first meeting but he did not use the term "arthroscopy." Dr. Bach stated that he would go in and take a look at the shoulder and see how much damage was done and then repair it. Dr. Bach did not tell plaintiff the surgery could be performed as outpatient surgery.

¶ 29    Plaintiff stated that no doctor was able to give him a guarantee that if the surgery was performed he would return to the same functioning level as before his injury. However, at the time of the hearing he had decided he did not want a surgical procedure performed, regardless of the outcome. He explained that although he had surgery in the past, over the years things have changed. His mother-in-law was in the same situation with anesthesia 18 months prior and "never came off that table." After completing physical therapy, even though he still had pain and lack of range of motion, he was able to take care of his personal hygiene. He testified that he had to weigh the risks against the benefits of surgery, and he decided that he was never going to be lifting weights above his head for the rest of his life, so he did not want surgery.

¶ 30    Plaintiff further testified that he was always under the impression that he had a complete tear in his rotator cuff, until the morning of the hearing when he read through medical records.

¶ 31    Finally, plaintiff testified that he had been working for the Fire Department for 36 years and could have retired with full pension but had kept working because he wanted to continue working as a DDC.

¶ 32    Dr. Motto testified that he reviews medical records, examines applicants, and reports to the Board. He filed a report in connection with plaintiff and sent him out for an independent medical examination because the medical records and the initial radiologist report showed "no rotator cuff tear." Then Dr. Bach said that on two views it did show a partial rotator cuff tear, and one of Dr. Bach's notes said it was a relatively minor situation and that he suggested a cortisone injection. But the initial notes show that Dr. Bach had said surgery was a possibility. Then the functional capacity evaluation took place, which was "quite good" in the sense that plaintiff was lifting heavy objects.

¶ 33    Dr. Motto testified that he could not figure out whether Dr. Bach had, or had not, recommended surgery. He mentioned to plaintiff that surgery may be very minor and correct the problem, but plaintiff refused anesthesia, so Dr. Motto sent plaintiff to an independent medical examiner, Dr. Marra. Dr. Marra reviewed the MRI and agreed that there was a partial thickness tear and that plaintiff could have relatively minor outpatient surgery to repair the tear, with a good chance that plaintiff could go back to work as a firefighter. Dr. Motto testified that he absolutely agreed that arthroscopic shoulder surgery was an option and was safe and that there was a good chance plaintiff could improve his situation with the surgery. Dr. Motto testified that the arthroscopic surgery is typically done with a general anesthetic, so plaintiff would be completely knocked out.

¶ 34    Dr. Motto further testified that based on his review of the 2007 job posting for DDC, plaintiff could perform those functions without surgery, in his current condition, and that plaintiff had told him he could perform the administrative and supervisory duties of his job.

¶ 35    When asked if he thought plaintiff, in the condition he is in now, could go into a burning building, Dr. Motto answered that no, he could not be a firefighter paramedic in his current state. He testified that plaintiff certainly could not carry a 200-pound person down the stairs, but a DDC is an overall command and supervisory position.

¶ 36    At the close of the hearing, the Board members voted to deny plaintiff disability benefits. According to the Board's written order, the evidence established that plaintiff incurred only a minimal tear in the rotator cuff of his right shoulder, and that after physical therapy and work-hardening, plaintiff was able to achieve a very high level of physical demand functioning below the waist and medium level above the waist. The job description of a DDC lists almost exclusively administrative and supervisory duties, and does not contain a description of the physical demand functioning level required of a DDC. Further, plaintiff did not provide the Board with any written evidence as to the level of physical demands required of a DDC.

¶ 37    The Board additionally found that the weight of medical opinions in the record established that there was a medical treatment available to plaintiff that would have, more likely than not, repaired the minor tear in his right shoulder and allowed him to perform at the very heavy level of physical demands if called upon. Plaintiff's refusal to have the arthroscopic procedure to repair the small tear in his rotator cuff was not reasonable given the nature of the procedure, the risks involved, the likelihood of a successful outcome, and the fact that plaintiff had successful surgical procedures in the past.

¶ 38    After weighing all the evidence in the record, the Board denied plaintiff's application for

disability pension for *either or both* of the following reasons:

"a) it is more likely than not that [plaintiff] can perform his assigned duties as a DDC with the current condition of his right shoulder,

b) it is more likely than not that [plaintiff] would have the small tear in his right shoulder successfully repaired with an arthroscopic medical procedure that does not involve any extraordinary risks and, therefore, any state of disability that he is experiencing at this time is the direct result of his unreasonable refusal to have the medical procedure and not the original injury."

¶ 39    Plaintiff filed a complaint under the Administrative Review Law (735 ILCS 5/3-110 (West 2008)) in the circuit court of Cook County to review the decision of the Board. The circuit court affirmed the Board's decision and plaintiff now appeals.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, plaintiff contends that the Board's denial of his application for disability benefits was improper. Specifically, plaintiff argues that the Board's finding that he was not disabled and could return to work as a DDC in his current physical state was against the manifest weight of the evidence, and that the Board's finding that plaintiff's injury was a "direct result" of his refusal to undergo surgery was also against the manifest weight of the evidence.

¶ 42    On administrative review, we review the decision of the administrative agency, here the Board, as opposed to the decision of the trial court. *Bauer v. State Employees' Retirement System of Illinois*, 366 Ill. App. 3d 1007, 1013 (2006). The Administrative Review Law states that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2008). "[O]n administrative review, it is not a court's function to reweigh the evidence or make an independent determination of the facts. Rather, the court's function is to ascertain whether the findings and decision of the agency are against the manifest weight of the evidence." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id*.

¶ 43    The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings, and the reviewing court may not substitute its judgment for that of the administrative agency. *Abrahamson*, 153 Ill. 2d at 88. "If the record contains evidence to support the agency's decision, it should be affirmed." *Id*.

¶ 44    Plaintiff's first contention is that the Board's finding that he was not disabled, and could return to work as a DDC in his current condition, was against the manifest weight of the evidence.

¶ 45    The Illinois Pension Code (Pension Code) provides that a fireman is entitled to duty disability if he can establish that he is disabled and that the disability was caused by an injury resulting from an act of duty. 40 ILCS 5/6-151 (West 2008). A fireman is defined as any

-7-

person who is employed in the fire service of a city on the effective date of the statute, who was a contributor to, participant in, or beneficiary of any firemen's pension fund. 40 ILCS 5/6-106 (West 2008). Here, there is no dispute that plaintiff was a fireman for purposes of the statute and that the injury occurred while plaintiff was on duty. However, the parties disagree as to whether plaintiff is "disabled" as that term is defined under section 6-112 of the Pension Code. 40 ILCS 5/6-112 (West 2008).

¶ 46    Section 6-112 of the Pension Code (40 ILCS 5/6-112 (West 2008)), defines disability as a "condition of physical or mental incapacity to perform *any* assigned duty or duties in the fire service." (Emphasis added.) Plaintiff contends that the Board's finding that he could perform the duties of DDC was against the manifest weight of the evidence because: (1) plaintiff testified that a DDC is expected to respond to emergencies, (2) both plaintiff and Duber testified that a DDC participates in training drills and responds to emergencies, (3) the 2007 job positing states that a DDC may respond to emergencies, and (4) the Board failed to present any testimony from anyone within the Department to contradict plaintiff and Duber's testimony. The Board responds that plaintiff failed to present evidence that he had an inability to perform the job functions of a DDC and that there was no written evidence presented of the physical demands of a DDC. We agree with the Board and find that its conclusion that plaintiff could perform the duties of DDC in his current condition was supported by the record. See *Abrahamson*, 153 Ill. 2d at 88 (if the record contains evidence to support the agency's decision, it should be affirmed).

¶ 47    The record includes a copy of the 2007 job posting, which describes the duties of a DDC as follows:

"**DUTIES**: Under direction, a Deputy District Chief directs responses to fire emergencies and administrative operations of an assigned shift within a district/division. Assumes control of firefighting personnel and operations under his/her command at a fire scene. Continually assesses the scene of fire emergencies ensuring adequate firefighting and EMS manpower and equipment are present and makes adjustments as needed. Assumes command in the absence of the District Chief. Ensures established protocols, policies, and procedures are adhered to during fire operations. Conducts inspections of fire personnel and equipment to ensure compliance with department protocols. Communicates and interprets departmental policies and procedures and ensures adherence to the Fire Commissioner's command orders. Directs the preparation of operational and administrative reports. Disciplines staff in accordance with departmental policies and the contract provisions. May provide in-service training to department personnel on the National Fire Incident Reporting System (NFIRS) and related EMS and HIPPA issues. May coordinate public education programs to bring awareness in fire hazards and protection. May respond to Hazardous Material (HAZMAT) and air/sea rescue incidents. May coordinate the investigation into the causes of major fire incidents. May respond to and take control of an Emergency Medical Services (EMS) incident citywide. Performs related duties as required."

¶ 48    Dr. Motto testified that based on his review of this job posting, plaintiff could perform all of the listed functions in his current condition, without surgery. Plaintiff did not present any evidence, except his own testimony, to suggest that a DDC is required, in addition to the

duties listed on the job posting, to be able to perform every function of an active firefighter in order to be a DDC.

¶ 49    The evidence shows that after physical therapy had been completed, plaintiff underwent a functional capacity evaluation, in which plaintiff showed the ability to lift in the "Heavy Level" to "Very Heavy Physical Demand Level" for lifting below waist level. He was able to carry up to 68 pounds in the "Heavy Physical Demand Level," push 110 pounds in the "Very Heavy Physical Demand Level," and pull 100 pounds in the "Heavy Physical Demand Level." Plaintiff also simulated poking a hole in a roof, carrying a fire hose up stairs, and going up and down a ladder. He did not show any limitations with the simulation except for cardiovascular fatigue.

¶ 50    Plaintiff is correct that Dr. Perry determined that, at that time, plaintiff "is not capable of meeting critical job demands of his pre-injury job as a Fire Fighter." However, Dr. Perry's evaluation appears to be based on his understanding that plaintiff was an active firefighter, and not a DDC. We note that a person is not entitled to disability "solely by reason of the fact that he is no longer able to perform the duties of a firefighter." *Peterson v. Board of Trustees of the Firemen's Pension Fund*, 54 Ill. 2d 260, 264 (1973). Rather, a plaintiff must show that he is incapable of performing "any" assigned duty with the fire department. See 40 ILCS 5/6-112 (West 2008); see also *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 469 (2009) (A person who cannot return to full fire fighter duties still may not be disabled within the meaning of the Code "if a position is made available to her which can be performed by a person with her physical disability." (Internal quotation marks omitted.) (citing *Peterson v. Board of Trustees of the Firemen's Pension Fund*, 54 Ill. 2d 260, 263-65 (1973))).

¶ 51    Here, as stated above, there is no evidence to suggest that plaintiff, with his current physical limitation, would be unable to perform the functions of a DDC. Rather, "[t]here was sufficient evidence in the record to support the conclusion of the Board that a position in the [Fire Department] is available for [plaintiff] and that he is physically capable of performing the duties of this position." *Peterson*, 54 Ill. 2d at 263. Plaintiff went through work-hardening, after which Dr. Bach determined that plaintiff had reached a maximum medical improvement. Dr. Bach recommended that he be released with permanent restrictions of no lifting or carrying greater than 15 pounds on occasion or 25 pounds frequently, and no overhead use of his right arm. Dr. Bach specifically stated that plaintiff could "return to work with modified restrictions."

¶ 52    While plaintiff and Duber testified that a DDC is expected to respond to emergencies, plaintiff presented no evidence to show that a DDC is *required* to respond to emergencies, and no evidence to show that his physical restrictions would prevent him from responding to emergencies and assuming responsibility of the other fire fighters while on the scene of those emergencies, rather than actively participating in fighting the fire. In fact, plaintiff testified that a DDC could be expected to respond to emergencies, but that once he responded to a scene his duties would include organization, logistic strategy, administration, and protection. There is absolutely no evidence to suggest that plaintiff would be unable to perform these functions in his current condition.

¶ 53      Moreover, to the extent that plaintiff's testimony suggested that a DDC had to be able to perform all the functions of an active firefighter, we note that faced with a conflict of evidence, it would be the "Board's function, as the finder of fact, to assess the credibility of the documentary information and the testimony of the witnesses and to determine the appropriate weight to be given the evidence." *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006) (*per curiam*). As stated above, the findings of fact made by the Board are, by statute, held to *be prima facie* true and correct and may only be reversed if they are against the manifest weight of the evidence–"a very high threshold to surmount." *Marconi*, 225 Ill. 2d at 540. Here, we find that plaintiff did not surmount that threshold. We hold that the Board's decision to deny plaintiff a disability pension was not against the manifest weight of the evidence. The record contains sufficient evidence to support the Board's decision, and we certainly cannot say that it is clearly evidence that the Board should have reached the opposite conclusion. See *Abrahamson*, 153 Ill. 2d at 88.

¶ 54      Plaintiff also argues on appeal that the Board's finding that any state of disability he is experiencing at this time is the direct result of his unreasonable refusal to have the medical procedure, and not the original injury, is against the manifest weight of the evidence. We note, however, that the Board found plaintiff disabled for "either or both" of two reasons. The first was that he was not disabled and could perform his assigned duties as DDC in his current condition, and the second was that his refusal to undergo surgery as the reason for his remaining disability. Because we affirmed the Board's finding that defendant was not disabled, we need not address whether the disability was caused by his refusal to undergo surgery. See *Reyes v. Walker*, 358 Ill. App. 3d 1122, 1124 (2005) (we may affirm on any basis warranted by the record).

¶ 55      For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 56      Affirmed.

¶ 57      JUSTICE CUNNINGHAM, specially concurring.

¶ 58      I specially concur with the holding of the majority but reach my conclusion for different reasons. I disagree with the majority's statement that there is "no evidence to suggest that plaintiff, with his current physical limitation, would be unable to perform the functions of a DDC." *Supra* ¶ 51. Plaintiff's testimony strongly refutes that and the medical evidence suggests otherwise. However, the Board chose to overlook or reject plaintiff's testimony and selectively focused on those narrow parts of the medical evidence which support its ruling. That is entirely within its discretion. It is also interesting that the Board discusses the fact that plaintiff's disability could likely be cured by surgery. The Board castigates plaintiff for refusing surgery. It suggests that plaintiff's disability is his own doing because of his refusal to undergo surgery. While the majority does not base its holding on that argument, or even acknowledge that it was a factor in the Board's decision, I believe it is indicative of the Board's true motive in this case.

¶ 59      Nevertheless, plaintiff had the burden of proof in establishing his disability in accordance with the petition which he filed. There is nothing in the record to show that plaintiff

attempted to present any objective, expert testimony to support his own testimony that the duties of a DDC were beyond his current capabilities given his undisputed injury and current condition. Further, there is nothing in the record to suggest that the plaintiff was offered a comparable but similar position within the department which would accommodate his current disability. Thus, I can find no support in the record for the majority's assertion that plaintiff was offered an alternative position in the department that he would have been able to accept given his disability. On the contrary, the Board argued strongly that plaintiff could perform the work of a DDC because the job does not require the type of physical activity that plaintiff's disability precludes.

¶ 60        During oral argument, plaintiff's counsel suggested that plaintiff's disability is so patently obvious that plaintiff's sole testimony on that point was sufficient. Clearly, it was not. Having the burden of proof means that it is plaintiff's obligation to put his best evidence before the Board to substantiate his claim. That is the best use of expert testimony, which could have fulfilled that burden of proof. Instead, plaintiff chose to rely on his own testimony, which the Board treated as self-serving and soundly rejected. Plaintiff had it within his power to choose the evidence that would support his claim. Inferences and common sense favor plaintiff's claim that he is disabled and cannot perform the duties of a DDC, but he did not prove it with sufficiency to overcome the Board's findings against him. During oral argument before this court, the attorney representing the Board suggested that it is the Board's duty to protect its funds from being dissipated by unfounded claims. Given the Board's ruling in this case, it is safe to conclude that it found plaintiff's claim to be unfounded. Stated another way, the Board prefers to find that no disability exists, thereby negating the need to pay out money from the fund.

¶ 61        It is undeniable that plaintiff was functioning in the capacity of a DDC when he sustained the disabling injury that is the subject of this litigation. There was no suggestion that plaintiff was acting beyond the scope of his job description when he was injured. It is mind-boggling that the Board now argues that a DDC's job can be easily handled by someone who has plaintiff's disability. Therefore, it asserts, plaintiff is not disabled for purposes of his job. This is circular reasoning designed to deny plaintiff's petition, and it worked only because there was no expert testimony to challenge the Board's assertion. There is no question that the plaintiff could have buttressed his claim of disability with expert testimony. That testimony could have explained the job description of a DDC; actual activities of a DDC in a variety of job duties including those which plaintiff cannot now perform; that there was no change in a DDC's job from the time that plaintiff suffered his disabling injury until the time of his petition; and that in his current condition plaintiff could not now perform the activity which caused the disabling injury.

¶ 62        In other words, the testimony could have established that plaintiff could no longer perform the complete duties of a DDC. Such expert testimony would have changed the dynamics of the litigation and required the Board to address the substance of plaintiff's claim. The job description which the Board relied upon suggests that the role of a DDC is strictly supervisory and administrative. Other facts in the record refute that conclusion. However, the Board ignored that evidence. One only has to look at how plaintiff sustained his disabling injury to conclude that a DDC's job *is not* purely supervisory or administrative.

Given the unrefuted medical evidence of plaintiff's limitations as a result of the injury suffered while in the capacity of a DDC, expert testimony would have provided objective support for plaintiff's argument that he is in fact disabled. It would also have subjected the Board's two-prong, conflicting argument[1] to scrutiny while highlighting the duplicity of the argument. Specifically, at the very least, the Board would have had to present its own experts to counter plaintiff's evidence. However, by failing to meet his burden of proof, plaintiff gave the Board an easy way out. Accordingly, I must agree with the majority that the Board's ruling was not against the manifest weight of the evidence.

---

[1]The Board makes a two-prong argument on appeal. First, it argues that plaintiff is not disabled. Second, it argues that plaintiff is responsible for his own disability by failing to submit to surgery.