2015 IL App (1st) 141350

FIRST DIVISION
March 9, 2015

No. 1-14-1350

| | | |
|---|---|---|
| PATRICK J. HOWE, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff- Appellant, | ) | |
| | ) | |
| v. | ) | No. 13 CH 27714 |
| | ) | |
| THE RETIREMENT BOARD OF THE FIREMEN'S | ) | |
| ANNUITY AND BENEFIT FUND OF CHICAGO, | ) | |
| | ) | Honorable Kathleen M. Pantle, |
| Defendant-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1     This case comes before us for a second time to review whether the defendant Retirement

Board (Board) of the Firemen's Annuity and Benefit Fund of Chicago (FABF) properly denied

plaintiff's application for a duty disability benefit, which plaintiff had filed pursuant to section 6-

151 of the Illinois Pension Code (Pension Code) (40 ILCS 5/6-151 (West 2010)).  On our initial

review, we did not reach the merits of the underlying claim because we found the Board never

validly took final action on the application.  *Howe v. Retirement Board of the Firemen's Annuity

& Benefit Fund*, 2013 IL App (1st) 122446.  We vacated the Board's decision and remanded the

cause with instructions for the Board to take valid final action by conducting a proper affirmative

vote on a specific written decision.  After a majority roll call adopting its written decision to

deny plaintiff a duty disability benefit, plaintiff filed a second complaint for administrative

review.  The circuit court affirmed the Board's administrative decision.  For the following

reasons, we confirm the Board's decision and affirm the circuit court's judgment confirming the Board.

¶ 2                                    I. BACKGROUND

¶ 3     The underlying facts are largely uncontested and are set forth in the administrative record.  Plaintiff Patrick J. Howe became an employee of the City of Chicago (City) on June 16, 1977, and was assigned to the Chicago fire department (CFD) as a paramedic within the department's bureau of emergency medical services.  Howe was promoted within the paramedic ranks to the level of paramedic field chief.  He remained in the field as a paramedic until 1984.

¶ 4     In 1984, Howe began work on a new assignment at the CFD's training academy.  In 1996, Howe accepted a CFD managerial position, commonly referred to as an "exempt rank" position.  In the new position, Howe worked on personnel and employee relations matters in the department's administrative services division.  Howe negotiated contracts, performed grievance resolution, and developed department examinations.  Eventually, he became deputy district chief of employee relations.

¶ 5     In 2002, the CFD assigned Howe to work at its headquarters located at 10 West 35th Street in Chicago.  His regular working hours in the administrative services division were from 8 a.m. to 4:30 p.m.  As deputy district chief of employee relations, his duties did not include mitigating any emergency in the City nor commanding emergency incidents.

¶ 6     Howe also continued, however, to perform some limited paramedic duties.  The CFD stored a complete inventory of advance life support and medical response equipment at the headquarters.  Every paramedic stationed at CFD headquarters was required to respond to any emergency medical services incident and provide care within the building or on adjacent streets.  Howe maintained his State of Illinois paramedic license and, since he never signed a form with

the CFD that would have relieved him of an obligation to perform paramedic duties while he served in an exempt rank capacity, he was obligated to respond to calls for emergency medical services when so notified by the City's office of emergency communication. Howe was not the only paramedic stationed at CFD headquarters. Howe often responded as a paramedic to emergencies at headquarters or the surrounding area, but most of those times, other CFD personnel were with him. In case of an emergency at headquarters or the surrounding area, ambulances and fire engines from other stations were also available to respond.

¶ 7 Although Howe normally served from 8 a.m. to 4:30 p.m., his duties sometimes required him to be "on call" on a 24-hour basis. One of these on-call assignments was serving a rotation as the CFD's media affairs officer. In this capacity, Howe was on call for 24 hours a day for a one-week period.

¶ 8 On February 25, 2002, Howe was serving as media affairs officer. After leaving CFD headquarters at the end of his regular workday, Howe proceeded on his route home, driving his CFD-issued vehicle southbound on the Dan Ryan Expressway (Ryan). At approximately 5 p.m., a call came over the CFD radio in his vehicle announcing that a man had fallen from a platform onto the rail tracks at the train station located at 63rd Street and the Ryan.

¶ 9 Although Howe was not ordered by the CFD or the office of emergency management communication to go to the scene of the incident, Howe chose to self-dispatch and exited the Ryan at the off-ramp. According to Howe, he chose to respond because this type of an incident "always attract[s] media attention," and he thought it would best to respond to the dispatch. He also chose to respond because he is a licensed paramedic and wanted "to see if [he] could help with this patient as well."

¶ 10 As Howe parked his vehicle outside the 63rd Street train station, a fire truck from CFD

Engine Company 84 also pulled up. Howe grabbed a "quick response bag" (QRB) from the trunk of his vehicle, which was stocked with emergency supplies that a paramedic would carry as a first responder. Howe could not recall being required by the CFD to have a QRB in his vehicle, but he did keep one in his trunk. Howe followed the firefighters from Engine 84 into the station. He observed that no Chicago Transit Authority (CTA) personnel were present. The CTA attendant on duty was on the railroad tracks assisting the man who had fallen.

¶ 11 Because the CTA attendant was not present to open the ticket booth or unlock the turnstile, Howe decided to leap over the turnstile in the same manner a gymnast would leap over a vault. He pressed his hands down on either side of the turnstile and boosted his body weight up, throwing his legs up and over the turnstile. At that point, Howe felt a "pop" in his right shoulder with extreme pain. According to Howe, on a scale from 1 to 10, the amount of pain he felt "was easily a ten." Howe suspected that he had dislocated his shoulder.

¶ 12 Howe descended the stairs to the platform. As soon as he arrived onto the platform, he observed the firefighters of Engine Company 84 beginning the process of lifting the victim off the tracks. By the time the victim was placed back onto the platform, a CFD ambulance had arrived to assist. Howe did not render any medical treatment to the victim.

¶ 13 As Howe returned to his vehicle, he felt his right shoulder and arm stiffen. He called both his wife and the fire alarm office to tell them he needed to seek treatment at the hospital for his shoulder. The fire alarm office informed Howe that they would dispatch the appropriate chief to the hospital to investigate the incident. Howe drove himself to Little Company of Mary Hospital rather than call an ambulance because he "knew there was no need for [him] to tie up an ambulance for an injured shoulder."

¶ 14 Before his release from the hospital, Howe spoke to CFD Battalion Chief Gerald Peck,

who had been dispatched by the fire alarm office to investigate the circumstances of the injury. Battalion Chief Peck completed a CFD form reporting the injury, in which he assessed that the shoulder injury Howe sustained was duty-related.

¶ 15    Howe returned to duty 8 to 10 days after sustaining the injury. He underwent physical therapy and received steroid injections. When his shoulder failed to respond to treatment, Howe underwent a magnetic resonance imaging (MRI) test, which revealed a torn rotator cuff. The CFD medical section referred Howe to an orthopedic surgeon, Dr. Charles Bush-Joseph.

¶ 16    On August 5, 2002, Dr. Bush-Joseph initially performed arthroscopic surgery on the shoulder, which became open surgery because the damage was more severe than originally diagnosed. Howe returned to duty on October 31, 2002 and continued to work at the CFD for the next six years. His shoulder continued to bother him with increasing pain and weakness. He received injections for the pain.

¶ 17    In 2008, Howe's pain became much more severe and Howe returned to Dr. Bush-Joseph, who prescribed an injection and another course of physical therapy. Shortly thereafter, Dr. Bush-Joseph recommended a second surgical procedure. The MRI revealed no specific tear, but did indicate bone spurs and scar tissue which required removal.

¶ 18    On December 1, 2008, Dr. Bush-Joseph performed a second surgical procedure on Howe's right shoulder. Howe returned to duty in March 2009. He continued to undergo physical therapy, but the shoulder pain persisted and he did not regain his full range of motion. Howe returned to Dr. Bush-Joseph on July 17, 2009 for an arthrogram and another MRI. Howe needed a third surgery because of "recurrence of tearing" related to the original surgery. Dr. Bush-Joseph referred Howe to a shoulder specialist, Dr. Gregory Nicholson. Following an examination, Dr. Nicholson found the tear to be repairable and agreed that Howe required

surgery. The CFD's independent medical examiner, Dr. Preston Wolin, agreed with the recommendation for surgery in a report he provided to the CFD's medical director.

¶ 19    On March 1, 2010, Dr. Nicholson performed the third surgery on Howe's right shoulder. Thereafter, Dr. Nicholson provided a report to the CFD stating that Howe was " 'at maximum medical improvement and requires permanent restrictions. And those restrictions would be a 25-pound lift from floor to waist.' " Dr. Nicholson also recommended additional limitations of a 15-pound limit from waist to chest and a 25- to 30-pound limitation on pushing and pulling. In addition, Dr. Nicholson restricted overhead lifting.

¶ 20    According to Howe, the restrictions recommended by Dr. Nicholson prevented him from performing all the physical requirements of a paramedic. Howe testified that he could not return to work for the CFD unless he was able to perform all the physical duties of a paramedic.

¶ 21    On December 8, 2010, Howe signed a City "End of Employment Form," which is completed only if an employee is leaving City service. The form indicated that February 28, 2010 was the last day Howe worked for the CFD. His salary at the time of separation was $137,460. The form also indicated Howe's reason for leaving employment as "Applying for Pension Benefits."

¶ 22    Howe submitted his application for a duty disability benefit on December 15, 2010. Dr. Isaac Marcos, a CFD occupational health physician, submitted a report to Dr. George Motto of the FABF regarding Howe's application on January 26, 2011. In his report, Dr. Marcos detailed Howe's injury and history of treatment. Dr. Marcos' report noted that Howe "remains off-duty and has exhausted all his sick and injury leave."

¶ 23    On February 15, 2011, Dr. Motto submitted his report to the Board. Dr. Motto stated that Howe was injured "on duty suffering a significant rotator cuff tear in his right shoulder."

According to Dr. Motto, Howe "never really returned to normal." Dr. Motto noted that the strength in Howe's shoulder was markedly diminished to the extent that Howe was unable to lift his own medical record. The report stated, "performing his duties as District Chief in charge of Employee Relations was difficult and lifting relatively light materials around the office. He is at MMI [maximum medical improvement]."

¶ 24    On March 16, 2011, Howe testified before the Board at his hearing for application for a duty disability benefit. Under questioning from members of the Board, Howe agreed that he had the ability to carry out the duties of his career service type and could perform his administrative duties following his injury.

¶ 25    Although Howe worked in the employee relations section, he was required to respond to emergencies on a regular basis when he was on call. Howe stated that in his role as a media affairs officer, he would self-dispatch. Howe testified that he encountered incidents while driving his CFD vehicle many times. When asked by the Board whether he was required to respond to those incidents, Howe replied that, as a licensed paramedic, he "had a legal obligation to stop" if he saw an injured or ill person on the street.

¶ 26    Howe agreed that his primary responsibilities were established by his duties as deputy chief of employee relations. Howe explained that with his particular job duties, certain things, such as manipulating a computer mouse and other repetitive motions, become very difficult to perform. Writing was difficult and, because he is right-hand dominant, his handwriting had changed following his injury. However, Howe also stated, "I can do the work that I did." Howe specifically told the Board, "For the most part, I could do the work of Deputy Chief of Employee Relations but I still have a restriction of being able to do what I am supposed to do."

¶ 27    Howe testified that on the date he was injured, he responded to the incident both as a

media affairs officer and as a licensed paramedic. Howe grabbed his QRB in his capacity as a paramedic. The City paid for his injuries as on-duty injuries. According to Howe, "If there was a major incident that was attracting media attention, I would self-dispatch." Howe stated that he self-dispatched to "thousands" of incidents.

¶ 28 Howe neither discussed possible work accommodations pursuant to the federal Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 *et seq*. (1994)) with any CFD personnel, nor signed any CFD forms requesting such an accommodation. After Howe's third surgery, the CFD did not offer Howe an ADA accommodation. As deputy chief of employee relations, however, Howe was aware of the ADA accommodations within the CFD. As a 34-year employee of the CFD, Howe would receive the maximum allowable retirement annuity even if he were to receive no disability-related annuity.

¶ 29 Dr. Motto testified that he reviews medical records and examines applicants as a consultant to the FABF. Based on his review and examination of Howe, Dr. Motto concluded that Howe could not perform his duties as a paramedic for the CFD. The examinations and findings were solely directed to Howe's duties as a paramedic. Dr. Motto stated that the restrictions recommended by Dr. Nicholson would not prevent Howe from performing his administrative duties.

¶ 30 Immediately after the last witness's testimony concluded, the Board adopted a motion to recess into a closed executive session.[1] The Board reconvened, whereafter a motion was made to *grant* Howe's application. The motion was seconded, but the motion *lost* on a two to five

---

[1] The motion did not, as strictly required by section 2(a) of the Illinois Open Meetings Act (5 ILCS 120/2(a) (West 2010)), state the specific statutory exemption under which the Board could meet in closed session. Presumably, it was to deliberate on the evidence presented before a quasi-adjudicative body as permitted by section 2(c)(4) of the Open Meetings Act (5 ILCS 120/2(c)(4) (West 2010)).

vote. According to the transcript, immediately after the last member voted, the chairman stated: "Based on the Findings of Fact made by the Trustees, the Trustees have voted to deny you the benefit you have requested. You will be notified by mail of the Findings of Fact and the Board's decision."

¶ 31 No further proceedings were had on Howe's application on that date. The Board did not adopt, by majority *affirmative* vote, any motion disposing of the application. As a result, the application was left in limbo. However, the Board issued a written decision dated the same day as the hearing, March 16, 2011. The decision is signed only by the five board members who voted against the motion to grant the application. The written decision found that Howe "did not present sufficient evidence to meet his burden of proof to show that he was performing an act of duty as defined under section 6-110 of the Illinois Pension Code [(40 ILCS 5/6-110 (West 2010))] when he injured his right shoulder on February 25, 2002." The Board also found Howe failed "to prove that he was injured while on duty" and "meet his burden of proof to show that he is disabled as defined under section 6-112 of the Illinois Pension Code [(40 ILCS 5/6-112 (West 2010))]."

¶ 32 On May 6, 2011, Howe filed his complaint for administrative review in the circuit court. Howe argued that the Board's findings were against the manifest weight of the evidence and that the shoulder injury he sustained was incurred in and resulting from an act of duty, but he did not raise any issues regarding the method by which the Board adopted its written decision. Howe sought a reversal of the Board's determination.

¶ 33 On July 31, 2012, the circuit court issued a written opinion affirming the Board's decision. Howe appealed to this court and we declined to reach the merits because the Board did not comply with section 6-178 of the Pension Code (40 ILCS 5/6-178 (West 2010)), which

9

"specifically mandates an affirmative majority vote by the total membership of the board in order to *grant* an applicant a duty disability benefit." (Emphasis in original.) *Howe v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 2013 IL App (1st) 122446, ¶ 21. Furthermore, the Board chairman recited that the Board had made "findings" even though the decision containing the Board's findings "could not have been written at that time because the last witness had just testified." *Id.*, ¶ 22. The chairman also stated that the Board had "denied" the application, even though the only action the Board took was to vote *against* a motion to grant the application. *Id.* Finally, the Board did not take a valid final action under section 1 of the Open Meetings Act (5 ILCS 120/1 (West 2010)) because no public vote was taken to approve the written decision denying the application. *Howe*, 2013 IL App (1st) 122446, ¶ 32. We stated that "[n]o public body in Illinois subject to the Open Meetings Act can take final action by merely circulating some document for signature and not voting on it publicly." *Id.* ¶ 26. We reversed the circuit court's judgment confirming the decision of the Board, vacated the Board's decision to deny Howe his application for a duty disability benefit, and instructed the Board to render a valid final action in this cause. *Id.* ¶ 32.

¶ 34 A panel of the Third Division of this district recently adhered to the reasoning of *Howe* in finding that the actions of the Board of Trustees of the Police Pension Fund of the Village of Chicago Ridge failed to constitute valid final decisions on either of the plaintiffs' applications. See *Baldermann v. Board of Trustees of the Police Pension Fund*, 2015 IL App (1st) 140482, ¶ 33. Emphasizing the *Howe* decision, the court noted that "the written decision of a public body must be prepared and provided to each board member in advance of a board vote finally disposing of the matter under consideration." *Id.* ¶ 37.

¶ 35 On November 20, 2013, the Board conducted a proper affirmative majority vote on a

specific written decision. The Board found that Howe did not present sufficient evidence to meet his burden of proof to show that he was performing an act of duty as defined under section 6-110 of the Pension Code (40 ILCS 5/6-110 (West 2010)) when he injured his right shoulder. Because Howe did not prove that his original shoulder injury was incurred in or resulted from an act of duty, he was not entitled to a duty disability benefit under section 6-151 of the Pension Code (40 ILCS 5/6-151 (West 2010)). The Board also denied Howe's request for duty disability benefits because he failed to meet his burden of proof to show that he is disabled as defined under section 6-112 of the Pension Code (40 ILCS 5/6-112 (West 2010)). The written decision included the signatures of the three Board members who voted in the affirmative to deny Howe's request for duty disability benefits.

¶ 36    Howe then filed a second complaint in administrative review in the circuit court. He alleged that the Board's findings were against the manifest weight of the evidence and contrary to law. Howe asserted the Board improperly concluded that he was not engaged in an act of duty as that term is defined by sections 6-110, 6-112, and 6-151 of the Pension Code.

¶ 37    On May 5, 2014, the circuit court issued a written order finding that the Board correctly decided that Howe is not disabled for service in the CFD. The court noted that Howe was a deputy district chief of employee relations and was called upon to perform only administrative duties "and is still capable of performing those duties." The court found "[t]he mere fact that Howe cannot perform certain functions as a paramedic does not mean that he is disabled as defined in section 6-112." The court also found Howe failed to meet his burden to prove he met the statutory definition of a disabled firefighter by showing he could not perform *any* assigned duty or duties within the fire service. In addition, in the context of whether he could perform the duties of his career service rank, Howe presented no evidence or testimony that a paramedic field

11

chief has to perform the duties of a paramedic. Finally, the court found the Board correctly determined that Howe was not performing an "act of duty" as defined by the Pension Code when he injured his shoulder. In short, the court affirmed the Board's administrative decision. This appeal followed.

¶ 38                                                    II. ANALYSIS

¶ 39    On appeal, Howe argues the injury to his shoulder was incurred in and resulted from an act of duty under section 6-151 of the Pension Code (40 ILCS 5/6-151 (West 2010)). In making this argument, Howe suggests that we should apply the same duty standards as are contained in the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)). Howe contends he was performing an act of duty as the CFD media affairs officer when he responded to the radio dispatch on February 25, 2002. According to Howe, the CFD enabled him to respond to an emergency whenever the two-way radio installed in his CFD-issued vehicle transmitted an alert signaling that the skills of a paramedic might be needed. Howe also challenges the Board's finding that he could perform the administrative duties of a deputy chief of employee relations. He asserts this finding by the Board is both clearly erroneous and immaterial because it presupposes such a position was available to him.

¶ 40    The Board responds that Howe did not prove he was performing an "act of duty" as defined in article 6 of the Pension Code when he injured his shoulder. The Board argues that workers' compensation standards do not govern CFD employees who apply for pension and disability benefits under the Pension Code. The Board asserts Howe confuses the concept of causation under the Act with the issue of "act of duty" as that term is defined by the Pension Code. According to the Board, the need to provide information to the media did not require Howe to vault over the CTA station's turnstile. In addition, the Board argues its finding that

Howe is not disabled is supported by the evidence. The Board maintains Howe is not entitled to a duty-related disability benefit because he is capable of performing his assigned duties as a deputy district chief, even if he cannot perform the duties of an active paramedic.[2]

¶ 41                                          A. Standard of Review

¶ 42    Howe argues that this court should apply a *de novo* standard of review because this case presents a purely legal question. According to Howe, the Board's conclusion that his injury was not the result of an "act of duty" is contrary to law. Howe also seeks to apply the general test of "arising out of and in the course of employment" as applied in cases involving the Act.

¶ 43    The Administrative Review Law (5 ILCS 5/3-101 *et seq*. (West 2010)) governs our review of the Board's decision. "The scope of our review extends to all questions of law and fact presented by the record." *Village of Broadview v. Illinois Labor Relations Board*, 402 Ill. App. 3d 503, 505 (2010) (citing 735 ILCS 5/3-110 (West 2008)). "The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board State Panel*, 216 Ill. 2d 569, 577 (2005).

¶ 44    The Board's findings of fact are "held to be prima facie true and correct" (735 ILCS 5/3-110 (West 2010)) "and will be disturbed on review only if they are against the manifest weight

---

[2]    While this matter was under advisement, the Board filed a motion to strike footnote 10 on page 14 of Howe's reply brief. Howe urges us to take judicial notice of a newsletter entitled "Pension News," a publication of the FABF, which is not part of the record, citing *Department of Human Services v. Porter*, 396 Ill. App. 3d 701, 725 (2009). In *Porter*, however, the reviewing court took judicial notice of an administrative decision from another case because such a document falls within the category of readily verifiable facts. *Id*. "A reviewing court need not take judicial notice of contents found in the appendix attached to a brief, but not included in the record." *City of Chicago v. Harris Trust & Savings Bank*, 346 Ill. App. 3d 609, 615 n.2 (2004). The FABF newsletter is not a document that is part of the public record and is not instantly verifiable and unquestionable. Although we agree the footnote should be stricken because we cannot take judicial notice of the newsletter, we are not relying on it and, as such, we deny the Board's motion as moot.

of the evidence." *Village of Broadview*, 402 Ill. App. 3d at 505 (citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998)). The Board's findings of fact are against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008) (citing *City of Belvidere*, 181 Ill. 2d at 204).

¶ 45 The Board's conclusions of law are reviewed *de novo*. *Cinkus*, 228 Ill. 2d at 211. An agency's decision on a question of law is not binding on the reviewing court and, thus, the court's review is independent and not deferential. *Id*. at 210.

¶ 46 Cases that involve mixed questions of law and fact are subject to a clearly erroneous standard of review. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392 (2001). A mixed question of law and fact typically arises when "the historical facts are not in dispute and the issue is whether the established facts satisfy the statutory standard." *Village of Hazel Crest v. Illinois Labor Relations Board*, 385 Ill. App. 3d 109, 113 (2008). An agency's decision is clearly erroneous "only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 47 Based on the record before us, the parties are not disputing the facts of this case and the issues to be resolved involve whether the established facts satisfy the statutory standard in the Pension Code. Accordingly, we review the Board's decision under a clearly erroneous standard of review. *AFM Messenger*, 198 Ill. 2d at 392, 395; *Village of Hazel Crest*, 385 Ill. App. 3d at 113. See also *Rokosik v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 374 Ill. App. 3d 158, 166 (2007) (applying clearly erroneous standard).

¶ 48                    B. Whether the Injury Resulted From An Act of Duty

¶ 49    Turning to the merits, Howe argues that his injury was incurred in and resulted from an act of duty.  Howe insists the applicable standard under the Pension Code should be the same general test of " 'arising out of and in the course of employment,' applied in workers' compensation cases," quoting *Wilfert v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 263 Ill. App. 3d 539, 544 (1994).  Howe asserts the CFD anticipated and enabled his response to emergency calls at any time, and cites numerous Illinois cases applying the Act for injuries sustained traveling to or from the workplace.  Howe contends he was injured while serving as a CFD media affairs officer because a man falling on the CTA tracks was a newsworthy event.  As such, he was "engaged in an 'act imposed on an active fireman *** by the rules or regulations of' the CFD, which is how an 'act of duty' is defined by the third disjunctive clause of § 6-110 of the Pension Code."  Howe also asserts he was injured in an act of duty because he responded to the incident as a paramedic by removing his QRB from the trunk and bringing it to the scene.  According to Howe, he detoured from his trip home to render the type of assistance that he was certified to perform as a CFD paramedic.

¶ 50    The Board responds that, instead of focusing on the plain language of the relevant section of the Pension Code that defines "act of duty," Howe attempts to divert this court's attention to cases applying the Act that do not govern CFD employees who apply for pension and disability benefits under the Pension Code.  The Board points out that the Act does not include a definition of "act of duty."  In addition, the Board argues that Howe confuses the concept of causation under the Act with the issue of "act of duty."  The Board notes that the parties do not dispute Howe was injured on February 25, 2002 and, thus, there is no causation issue in this case.  In sum, the Board argues that Howe was not injured while performing an act of duty.

¶ 51    Section 6-151 of the Pension Code provides in pertinent part:

> "An active fireman who is or becomes disabled on or after the effective date as the result of a specific injury, or of cumulative injuries, or of specific sickness incurred in or resulting from an act or acts of duty, shall have the right to receive duty disability benefit during any period of such disability for which he does not receive or have a right to receive salary, equal to 75% of his salary at the time the disability is allowed."   40 ILCS 5/6-151 (West 2010).

The Pension Code defines an act of duty as follows:

> "Any act imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person."   40 ILCS 5/6-110 (West 2010).

The Pension Code defines "disability" as "[a] condition of physical or mental incapacity to perform any assigned duty or duties in the fire service."   40 ILCS 5/6-112 (West 2010).

¶ 52    The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent, and the plain language of the statute is the best indication of that intent. *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 37-38 (2009).  "The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning."  *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 552 (2009).  "The statute should be evaluated as a whole, with each provision construed in connection with every

other section." *Id*. If the statutory language at issue is clear and unambiguous, a reviewing court must interpret the statute according to its terms without resorting to aids of statutory construction. *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995).

¶ 53                1. Applicability of the Workers' Compensation Act to This Case

¶ 54    Howe maintains *Wilfert* and additional Illinois authority support his contention that the Act must guide our interpretation of the phrase, "act of duty," instead of the Pension Code. According to Howe, the "act of duty" and "line of duty" standards for first responders are synonymous with the Act's causation test. The four cases upon which Howe relies, *Wilfert*, *Mabie v. Village of Schaumburg*, 364 Ill. App. 3d 756 (2006), *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 333 Ill. App. 3d 543 (2002), and *O'Callaghan v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 302 Ill. App. 3d 579 (1998), however, are each distinguishable from this case.

¶ 55    In *Wilfert*, the plaintiff appealed the Board's decision to deny him duty disability benefits after he suffered a reinjury from participating in " 'work hardening' " training. *Wilfert*, 263 Ill. App. 3d at 540, 542. The appeal, however, was limited solely to the issue of causation because there was a question of whether the injury was the plaintiff's sole cause of his disability. *Id*. at 543. The *Wilfert* court noted that article 6 of the Pension Code "serves an equivalent purpose to the objectives of workers' compensation" and is to be liberally construed in favor of the applicant to achieve that beneficent purpose. *Id*. at 542-43 (citing *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 95 Ill. 2d 211, 217 (1983)). Although the term "act of duty" has a specific statutory definition in the Pension Code, the *Wilfert* court concluded that "the broader phrase 'incurred in *or resulting from* an act or acts of duty' that appears in section 6-151 [citation] should be interpreted similarly to the phrases quoted from the Workers'

Compensation Act in *Unger* [*v. Continental Assurance Co.*, 107 Ill. 2d 79 (1985)]." (Emphasis in original.) *Id*. at 544. As a result, the reviewing court found the plaintiff presented a *prima facie* case that the injury was a cause of his disability and that he aggravated a preexisting injury as the result of an act or acts of duty. *Id*. at 545-46.

¶ 56 This case is distinguishable from *Wilfert* for two reasons. First, causation, an issue of fact determined by the Board (*Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534-36 (2006)), is not in dispute. We know causation is not at issue because Howe specifically requested *de novo* review and acknowledged in his opening brief that "the occurrence facts are admitted or established." The injury was caused by Howe attempting to vault a CTA turnstile. Second, and more significantly, *Wilfert* did not involve an examination of whether the plaintiff met his burden of proving his injury occurred as the result of an act of duty as defined by the Pension Code. Our legislature set forth a specific definition of what constitutes an act of duty in article 6 of the Pension Code. "It is well established that when a statute defines the terms it uses, those terms must be construed according to the definitions contained in the act." *State Farm Mutual Automobile Insurance Co. v. Universal Underwriters Group*, 182 Ill. 2d 240, 244 (1998). If the statutory language at issue is clear and unambiguous, a reviewing court must interpret the statute according to its terms without resorting to aids of statutory construction. *Branson*, 168 Ill. 2d at 254. The plain language of section 6-110 makes clear that the legislature only intended duty disability benefits to be paid to those "active firem[e]n" that were engaged in specific acts as delineated by the statute. 40 ILCS 5/6-110 (West 2010). Accordingly, our focus remains on whether Howe's injury occurred as the result of an act of duty as specifically defined by section 6-110 of the Pension Code (40 ILCS 5/6-110 (West 2010)). Thus, *Wilfert* is inapplicable.

¶ 57 In *Mabie*, the plaintiff, a full-time firefighter who sustained injury from falling down the

fire station stairs on his way to roll call, was awarded workers' compensation for his injury by an arbitrator. *Mabie*, 364 Ill. App. 3d at 757. The Village of Schaumburg (Village) eventually settled the workers' compensation claim with the plaintiff, after which he filed a complaint for injunctive relief pursuant to the Public Employee Disability Act (PEDA) (5 ILCS 345/0.01 *et seq.* (West 2000)). The plaintiff sought an order directing the Village to reinstate his sick leave and vacation benefits. "Under PEDA, a firefighter who suffers an injury 'in the line of duty' shall continue to be paid by his employer on the same basis as before his injury, with no deduction from sick leave credits, overtime accumulation, or vacation." *Mabie*, 364 Ill. App. 3d at 757 (quoting 5 ILCS 345/1 (West 2000)). The Village moved to dismiss the plaintiff's claim, alleging he waived his right to ask for additional benefits outside the settlement agreement. The circuit court dismissed the plaintiff's complaint.

¶ 58    On appeal, this court reversed and remanded the circuit court's decision in an unpublished order, finding the plaintiff could not have waived his claim under PEDA and that the settlement agreement did not have any *res judicata* effect on that claim. On remand, the plaintiff moved for summary judgment, arguing he suffered an injury in the line of duty that was compensable under PEDA and that the Village was barred from challenging the cause of his disability and its legal effect based on *res judicata* or collateral estoppel. The circuit court granted the plaintiff's summary judgment motion based on the doctrine of collateral estoppel.

¶ 59    In the second appeal, the *Mabie* court noted, "[b]ecause there is no definition of 'line of duty' in PEDA, and no cases directly on point, the parties rely on cases comparing workers' compensation claims with line-of-duty disability pension claims." *Id*. at 758. The court found "no meaningful difference between the 'line of duty' standard in PEDA and the causation test in workers' compensation claims–that the injury 'arose out of and in the course of employment.' "

*Id.* at 761.   According to the court, there was no reason to require a firefighter to provide different proof that he was injured in the line of duty under PEDA than he would in a "line-of-duty" pension case.  *Id.*   The court held the Village was collaterally estopped from relitigating the issue of causation based on the finding in the workers' compensation claim that the plaintiff's injury arose out of the course of his employment.  *Id.*

¶ 60    The *Mabie* decision is distinguishable because the court did not assess whether the plaintiff sustained his injury as the result of an act of duty as defined by the Pension Code. Notably, the *Mabie* court applied the reasoning in workers' compensation cases because there was no statutory definition for "line of duty" in PEDA.  Here, the Pension Code clearly defines "act of duty" and provides this court with a legislative guideline to determine whether to award a duty disability benefit.

¶ 61    The plaintiff in *Luchesi* suffered a shoulder injury when he fell while attempting to move a ladder from a fire truck.  The plaintiff suffered a partial tear of the rotator cuff, among other injuries.  Prior to undergoing surgery, the plaintiff was referred for physical therapy.  Despite his continuing efforts in therapy, the shoulder did not heal and required surgery.  Following surgery, the plaintiff began a new course of physical therapy, but he attended only three sessions.  The plaintiff refused further medical treatment despite the surgeon's prescription for an extended course of physical therapy.  The CFD terminated the plaintiff's employment because he missed medical appointments.  Thereafter, the plaintiff applied for duty disability benefits pursuant to section 6-151 of the Pension Code.  The Board concluded that the plaintiff failed to meet his burden of proving that " 'his disability was the result of a specific injury result from an act or acts of duty.' "  *Luchesi*, 333 Ill. App. 3d at 547.  The circuit court reversed the Board's decision. It found the Board made erroneous findings of fact and specifically held that section 6-151 of the

Pension Code did not disqualify an applicant from receiving benefits if he failed to attend every medical appointment. *Id*. at 547-48.

¶ 62    On appeal, the *Luchesi* court stated that the plaintiff "must prove only that the duty-related accident is a causative factor contributing to [his] disability." *Id*. at 550. Similar to *Wilfert*, causation of injury remained in dispute. The *Luchesi* court noted that "[c]ourts have interpreted the causal test under the [Pension] Code as similar to the test under the Act." *Id*. at 551. Finding that the circuit court correctly reversed the Board's decision, the *Luchesi* court explained the difference between the Pension Code and the Act regarding the reduction of benefits for refusal of medical treatment:

> "While [section 19(d)] of the Act authorizes the reduction or suspension of benefits based on the refusal of medical care, the Act does not authorize denial of benefits for any injury arising out of employment. The [Pension] Code includes no parallel to section 19(d) of the Act. Neither the Act nor the [Pension] Code permits denial of benefits for failure to get medical care–as long as the injury or disability results from acts in the course of employment."
>
> *Id*.

The plaintiff's failure to follow through with physical therapy did not warrant the denial of compensation because the evidence did not show that his refusal of treatment constituted the sole cause of his condition. *Id*. at 554. "The Act authorizes the reduction or suspension of compensation when the claimant unreasonably refuses medical treatment, but the [Pension] Code does not authorize such a reduction or suspension of benefits. From the use of different provisions we must presume that the legislature intended different results to follow." *Id*. The

court concluded, "In accord with the legislative intent to provide greater protection for police officers and firefighters, we hold that absent proof that [the plaintiff] would have fully recovered if he had all recommended treatment, his refusal of treatment does not justify any reduction in benefits under the [Pension] Code." *Id*. at 555.

¶ 63    The decision in *Luchesi* likewise is distinguishable from this case. The *Luchesi* court conducted its analysis with the conclusion that the injury was duty-related. *Id*. at 550. The court did not assess whether the plaintiff sustained his injury while in an act of duty as defined by the Pension Code. Furthermore, no comparable legislative guideline for reduction or denial of benefits was included in the Pension Code, which led the court to rely on section 19(d) of the Act in its determination. We do not have the same disadvantage, as the Pension Code defines "act of duty" and, thus, *Luchesi* is inapplicable.

¶ 64    The *O'Callaghan* case is instructive as it applies the specific definition of "act of duty" from the Pension Code. There, the plaintiff candidate firefighter sustained a knee injury while performing training drills during a mandatory CFD course. Following surgery, the plaintiff did not return to work and applied for duty disability benefits pursuant to section 6-151 of the Pension Code. The Board denied the plaintiff's application for duty disability benefits " 'for the reason that there is not sufficient evidence to substantiate that you are disabled *as a result of an act or acts of duty*.' " (Emphasis in original.) *O'Callaghan*, 302 Ill. App. 3d at 582. The circuit court confirmed the Board's decision.

¶ 65    In its decision denying benefits, the *O'Callaghan* court specifically applied section 6-110 to the facts surrounding the plaintiff's injury. The court noted that the CFD hired the plaintiff and that he was an active firefighter at the time of his injury. Applying section 6-110, the court stated CFD regulations "require all candidate firefighters to complete the training course before

22

obtaining a position at a fire station." *Id*. at 583. The court also applied *Wilfert* as part of its analysis, stating that "the knee injury he sustained was an act 'arising out of and in the course of the employment' " under the Act. *Id*.

¶ 66 Although the *O'Callaghan* court applied both section 6-110 and the Act in its analysis, there is no Illinois authority that specifically requires us to apply the Act in determining whether a plaintiff firefighter or paramedic sustained injury as the result of an act of duty. We follow the legislative mandate and apply section 6-110 of the Pension Code, as it is directly applicable to this case. See *Branson*, 168 Ill. 2d at 254 (if the statutory language at issue is clear and unambiguous, a reviewing court must interpret the statute according to its terms without resorting to aids of statutory construction).

¶ 67 2. Howe's Response as Media Affairs Officer Under Section 6-110

¶ 68 Section 6-110 of the Pension Code codifies the legislative intent to define an "act of duty" as: "(1) any act imposed on an active fireman by the ordinances of a city; (2) any act imposed on an active fireman by the rules or regulations of a city's fire department; or (3) any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." *O'Callaghan*, 302 Ill. App. 3d at 583. The legislature intended duty disability benefits be awarded to firefighters or paramedics for these specific acts. We agree with the Board's finding that, under section 6-110, Howe failed to present sufficient evidence to establish he sustained his injury as the result of an act of duty while he served as a media affairs officer on February 25, 2002.

¶ 69 Howe testified he was on his way home and, therefore, not actively engaged in CFD work, when he voluntarily chose to respond to the CFD radio announcement that a man had fallen onto the rail tracks at the 63rd Street CTA station. Howe presented no evidence to the

Board that, as a media affairs officer, he was compelled by City ordinance to self-dispatch to the 63rd Street CTA station. Howe stated in his reply brief that section 2-36-040 of the Chicago Municipal Code, which confers on the fire commissioner the "management and control of all matters and things pertaining to the fire department and of all the persons employed therein" supports his position. Chicago Municipal Code § 2-36-040. Howe argues the Commissioner alone cannot personally direct all 5,000 members of the CFD and that he must delegate that authority to subordinates. This portion of the Municipal Code, however, does not specifically require the media affairs officer to self-dispatch to an emergency the same way the CFD regulations required the plaintiff in *O'Callaghan* "to complete the training course before obtaining a position at a fire station." *O'Callaghan*, 302 Ill. App. 3d at 583. Howe presented no evidence of CFD rules or regulations that required him to self-dispatch to the scene of the incident.

¶ 70    Finally, Howe testified before the Board that he self-dispatched because "there was a major incident that was attracting media attention," not for purposes of saving the life of another person. Though he brought his QRB with him into the CTA station, he presented no evidence that the CFD required him to bring it with him in his capacity as a media affairs officer. Howe presented no evidence to the Board that he was required to respond as a paramedic outside the immediate vicinity of CFD headquarters while on call as a media affairs officer. Therefore, we find the Board correctly determined Howe was not injured as a result of an act of duty under section 6-110 in his role as media affairs officer.

¶ 71          3. Howe's Response as Paramedic Under Section 6-110

¶ 72    Howe testified that he also responded to the scene of the incident in his capacity as a paramedic. Howe told the Board he had a legal obligation as a licensed paramedic to stop and

help injured persons,[3] but presented no evidence of a statute or regulation requiring him to do so. In addition, while Howe testified he was also responding as a paramedic, the evidence is clear that he was off duty and driving home. Pursuant to section 6-110, we find Howe did not sustain injury as a result of an act of duty while responding as a paramedic to the incident.

¶ 73    C. Capacity to Perform Any Assigned Duty or Duties Under Section 6-112

¶ 74    Howe argues that, following his injury, he was physically unable to perform the duties of a paramedic. Howe also points to Dr. Motto's testimony that his injury also hampered his ability to perform his exempt rank duties as deputy district chief of employee relations. Howe asserts he is required to maintain his dual capacity role as paramedic and deputy district chief to respond to calls for emergency medical services when so notified by the fire alarm office. In addition, Howe contends that the Board simply assumed the position of deputy district chief of employee relations was still available to him because a deputy district chief position is an exempt rank position and considered temporary. Howe claims his career service rank remained as paramedic field chief, not deputy district chief and, therefore, he should be found disabled under the definition of section 6-112 as a paramedic. Howe also argues the CFD never offered him an ADA accommodation by allowing him to refrain from performing paramedic duties and remain a deputy district chief.

¶ 75    The decision in *Payne v. Retirement Board of the Firemen's Annuity & Benefit Fund*,

---

[3]    In contrast, police officers are often considered to be "on duty" constantly so as to require them to respond to any criminal incident which occurs in their presence. See *Garner v. City of Chicago*, 319 Ill. App. 3d 255, 262-63 (2001) (A police officer " 'is always obligated to attempt to prevent the commission of crime in his presence,' " and " 'any action taken by him toward that end, even in his official off-duty hours, falls within the performance of his duties as a police officer.' " (quoting *Banks v. City of Chicago*, 11 Ill. App. 3d 543, 550 (1973))); see also *Harroun v. Addison Police Pension Board*, 372 Ill. App. 3d 260, 264 (2007) (finding a police officer, although off-duty, performed an "act of duty" in attempting to apprehend a person he observed trying to break into his neighbor's home).

2012 IL App (1st) 112435, cited by Howe in support of his argument, is helpful on this point. There, the plaintiff firefighter injured his shoulder while falling from a ladder during a CFD training exercise. Just like Howe, the plaintiff in *Payne* tore his rotator cuff. He applied for duty disability benefits pursuant to section 6-151 of the Pension Code. At the time of his injury, the plaintiff served as a deputy district chief, which included witnessing drills, administrative duties, responding to fires, and " 'manpower.' " *Payne*, 2012 IL App (1st) 112435, ¶ 20. A deputy district chief in the plaintiff's position can choose whether to respond to fires or can also be called to respond to fires. The plaintiff acknowledged that the role of a deputy district chief is "supervisory." *Id*. ¶ 23. In the *Payne* hearing, Dr. Motto testified that the plaintiff could perform the functions of a deputy district chief and that the plaintiff had told him he could perform the administrative and supervisory duties of his job. Dr. Motto also stated that the plaintiff could not be a firefighter paramedic following his injury. The Board voted to deny the plaintiff duty disability benefits. The Board found "it is more likely than not that [the plaintiff] can perform his assigned duties as a [deputy district chief] with the current condition of his right shoulder." The circuit court confirmed the Board's decision.

¶ 76    The *Payne* court agreed with the Board and concluded that the plaintiff could perform the duties of deputy district chief in his condition. *Id*. ¶ 46. The plaintiff did not present any evidence, except his own testimony, to suggest that a deputy district chief must be able to perform every function of an active firefighter in order to be a deputy district chief. *Id*. ¶ 48. The *Payne* court specifically noted that "a person is not entitled to disability 'solely by reason of the fact he is no longer able to perform the duties of a firefighter.' " *Id*. ¶ 50 (quoting *Peterson v. Board of Trustees of the Firemen's Pension Fund*, 54 Ill. 2d 260, 264 (1973)). "[A] plaintiff must show that he is incapable of performing 'any' assigned duty with the fire department." *Id*.

(citing 40 ILCS 5/6-112 (West 2008)); see also *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 469 (2009) (A person who cannot return to full firefighter duties still may not be disabled within the meaning of the Pension Code "if a position is made available to her which can be performed by a person with her physical disability." (Internal quotation marks omitted.) (citing *Peterson*, 54 Ill. 2d at 263-65)).

¶ 77    In this case, there is no evidence to suggest that Howe, with his current physical limitation, would be unable to perform the function of a deputy district chief.  Dr. Motto testified that Howe is capable of performing administrative duties.  Howe acknowledged that he "could do the work of Deputy Chief of Employee Relations."  He specifically stated, "I can do the work that I did."  The mere fact that he has a physical limitation that prevents him from performing paramedic duties is not determinative of the issue of whether he is disabled as defined by section 6-112 of the Pension Code.  Howe did not present evidence to show that he is required to respond to emergencies as a deputy district chief.  Howe presented no evidence establishing that a paramedic field chief is required to perform the duties of a paramedic.  There is no evidence the CFD sought to terminate Howe because of his injury or because he could not perform the duties of a paramedic field chief.  In addition, there is no evidence the CFD threatened to remove Howe from his position as deputy district chief of employee relations or that the CFD failed to make available a position to Howe that he could perform which would allow him to continue his employment with the CFD.

¶ 78    "It is the duty of the court to enforce the law as enacted according to its plain and unmistakable provisions."  *Peterson*, 54 Ill. 2d at 264.  Our supreme court recognized that duty disability benefits are warranted under the Pension Code only when the facts establish the injury necessitated the retirement of the firefighter from service:

"The legislature could have provided pensions for fire fighters or other full-time appointed employees of the fire department who are no longer capable of performing the duties of their positions because of physical incapacity. It did not do so. We cannot now alter the plain language of the statute and through judicial construction incorporate such a provision in the Code." *Id.* at 264-65.

¶ 79 In short, Howe did not meet his burden of proving he is incapable of performing *any* assigned duty with the CFD. 40 ILCS 5/6-112 (West 2010). We find the Board correctly ruled Howe failed to meet his burden of proof to show that he is disabled as defined under section 6-112 of Pension Code.

¶ 80 III. CONCLUSION

¶ 81 We confirm the decision of the Board denying Howe duty disability benefits and affirm the circuit court's judgment confirming the Board.

¶ 82 Affirmed.