2020 IL App (1st) 182708-U
Order filed: February 7, 2020

FIRST DISTRICT
Fifth Division

No. 1-18-2708

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| NICOLE ACKERMAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| ROCKFORD G. YAPP, M.D. and | ) | |
| DIGESTIVE HEALTH SERVICES, S.C., | ) | |
| | ) | |
| Defendants-Appellees, | ) | No. 2016 L 011408 |
| | ) | |
| (Advocate Health and Hospitals Corporation d/b/a | ) | |
| Advocate Good Samaritan Hospital, | ) | Honorable |
| | ) | Mary B. Minella, |
| Defendant). | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    Held:    A jury returned a verdict in favor of defendants on plaintiff's medical malpractice action, and the trial court denied plaintiff's posttrial motion for a new trial. We affirmed the denial of plaintiff's posttrial motion, finding that the trial court did not abuse its discretion by refusing to allow her medical expert to perform a demonstration of a medical procedure before the jury that was dissimilar to the medical procedure actually performed on her by the treating physician. The trial court also committed no abuse of discretion by preventing plaintiff's medical expert from offering opinions about the causation and permanency of certain of her injuries, where the expert had no reliable basis for those opinions.

¶ 2    Plaintiff, Nicole Ackerman, filed a medical malpractice action against defendants, Rockford G. Yapp, M.D., Digestive Health Services, S.C,. and Advocate Health and Hospitals Corporation[1], alleging that Dr. Yapp committed medical malpractice when he perforated her esophagus while performing an endoscopy to remove a dental appliance that she had swallowed. Plaintiff contended that to repair the esophageal perforation, another surgeon performed a thoracotomy, in which her chest was opened and the tear was sewn up. Plaintiff allegedly suffered permanent injuries from the thoracotomy, which never would have happened had Dr. Yapp not negligently perforated her esophagus in the first place.

¶ 3    Plaintiff alleged that Dr. Yapp's negligence resulted from his use of a latex hood in the course of the endoscopy to remove the dental appliance, and that he should have used a so-called "overtube" instead, which would have reduced the chance of an esophageal perforation from occurring. Plaintiff also alleged that Dr. Yapp failed to obtain her informed consent for the procedure and that Digestive Health Services was vicariously liable for the actions of Dr. Yapp and for institutional negligence.

¶ 4    The jury returned a verdict in favor of defendants. On appeal, plaintiff argues that the trial court erred by: (1) refusing to allow her expert, Dr. Catalano, to demonstrate to the jury how an overtube could have been used to safely remove the dental appliance without perforating her esophagus; (2) precluding Dr. Catalano from offering causation opinions as to her post-surgical bowel evacuation problems; and (3) preventing Dr. Catalano from testifying about the permanency of her injuries. We affirm.

¶ 5                          I.  Pretrial Proceedings

---

[1] Advocate Health and Hospitals Corporation was voluntarily dismissed from the lawsuit after the motions *in limine*.

¶ 6     Prior to trial, the court was informed that the dental device had been discarded, and that plaintiff wished to use a replica of the device for demonstrative purposes at trial and to show the jury that the device could have safely fit inside of an overtube and been removed from her body without perforating her esophagus. Defendants filed a motion *in limine* to bar the use of the replica at trial. The court denied the *in limine* motion and allowed plaintiff to show the jury the device and describe it as an "exemplar," but not as a "replica."

¶ 7     Defendants also filed a motion *in limine* to bar Dr. Catalano's testimony that four of plaintiff's alleged injuries are permanent in nature: acid reflux, pain around the surgical site, constipation, and range of motion. Defendants argued in support of their motion that a physician may not testify to a patient's prognosis unless his opinions are based on a recent examination. There was no evidence that plaintiff had been examined by any treating physician for more than two years prior to trial. Dr. Catalano never met or examined plaintiff; his opinions about her current condition and the permanency of her injuries were primarily based on a single telephone conversation he had with her the night before his deposition.

¶ 8     The trial court granted the motion in part and denied it in part, allowing evidence that plaintiff's scars and acid reflux disease were permanent, but barring evidence that her range of motion injuries and constipation and pain around the surgical area were permanent.

¶ 9                                    II. Trial

¶ 10    At trial, plaintiff testified that the dental device at issue was a so-called "flipper," which fit in the space where she had two missing teeth. The device could be snapped in place like a retainer and had a clasp on the back and a wire in front and it had sharp edges. In the early morning on April 20, 2011, while kissing her boyfriend, the flipper became dislodged and passed down her throat. The next morning, plaintiff went to Good Samaritan Hospital's emergency

room and told the emergency room personnel that she had swallowed a dental appliance with sharp edges. An x-ray was taken, which was reviewed by the emergency room physician. He advised plaintiff that the flipper needed to be removed, and that he would send for a doctor who could perform the removal.

¶ 11    Dr. Yapp subsequently came into the emergency room and stated that he was the doctor who would perform the removal. Dr. Yapp told plaintiff that he would "go down [her] throat," and "grab the [flipper] and then bring it up" through her throat. Plaintiff expressed concern that during the removal, she might be injured by the sharp metal on either side of the flipper. Dr. Yapp explained that the instrument he would use during the removal contained a hood that would cover the flipper to prevent it from hurting her. Plaintiff signed a consent form for the procedure.

¶ 12    Dr. Yapp testified that he is a gastroenterologist who has practiced for over 25 years and has had experience in removing hundreds of foreign bodies from patients. On April 20, 2011, Dr. Yapp was employed by a practice group he had founded, Digestive Health Services. Dr. Yapp was called to the Good Samaritan Hospital emergency room by Dr. Steven Crouch to see plaintiff, who had swallowed a "dangerous device." Dr. Yapp reviewed the abdominal x-ray, which revealed a device with a "very long and torturous wire" in plaintiff's stomach.

¶ 13    Dr. Yapp spoke with plaintiff and obtained a description from her as to the "size and complexity and the danger of this device." Plaintiff informed him that the device was a flipper, which was a "large dental inserted plate that had two teeth and wires connected to it to help hold it in place." Dr. Yapp discussed different options with plaintiff. One option was to do nothing, which current medical literature recommended against because the flipper could travel into the

small bowel and cause a "complication." Dr. Yapp also discussed the possibility of surgery with plaintiff.

¶ 14     Dr. Yapp recommended removal of the flipper through her esophagus endoscopically. Dr. Yates explained that the endoscopic procedure contained a risk of perforation of the esophagus. Plaintiff agreed to the endoscopic procedure.

¶ 15     Dr. Yapp performed an esophagogastroduodenoscopy (EGD) on plaintiff. Dr. Yapp's initial approach or "pass" into plaintiff's stomach was by way of the endoscope, which has a camera and a light at its tip that gives the physician visibility as to the contents of the stomach. On the first pass, Dr. Yapp saw the flipper in plaintiff's stomach and took two pictures of it with the camera at the tip of the endoscope. Dr. Yapp saw that the flipper posed a danger to plaintiff as it had multiple sharp edges and "a wire almost like a fishhook." The flipper was over two and a half centimeters in length, meaning that it would be difficult to remove. Dr. Yapp believed that the best way to remove the flipper without harming plaintiff was to utilize a bell-shaped, latex hood, about five centimeters in diameter, that would cover the flipper during its removal from plaintiff's body.

¶ 16     Dr. Yapp withdrew the endoscope from the initial pass and fit the hood over the scope. Dr. Yapp reinserted the endoscope, utilized a snare to stabilize it, and pulled the flipper completely into the hood. Dr. Yapp then pulled the endoscope and attached hood up the upper esophageal sphincter and out plaintiff's mouth and successfully retrieved the flipper.

¶ 17     Dr. Yapp identified plaintiff's Exhibits 6, 7, and 8 as photographs of the flipper he removed from plaintiff.  Plaintiff was permitted to publish Exhibit 7 to the jury.

¶ 18    After Dr. Yapp performed the EGD on plaintiff, her subsequent treating surgeon, Dr. Schwartz, found a three-centimeter laceration, located just above the lower esophageal sphincter. Dr. Yapp testified as follows regarding the laceration of the esophagus:

"Q. Can you tell us which way the esophagus turns—

A. The lower esophageal sphincter is a *** circumferential muscle [that] holds the esophagus closed. The shape of the stomach, there is a slight curve that pushes on one side of the sphincter and the other side of the sphincter. So it's not completely symmetrical. ***

Q. And so that curve right above the lower esophageal sphincter, that adds what you might call a degree of difficulty to the removal of the sharp—

A. And complexity, correct.

Q. Complexity because it is an area, whereas you navigate the endoscope and the foreign object, they both have to turn with the esophagus otherwise there could be laceration and perforation?

A. It's high risk.

Q. And it's in that area where [plaintiff] was lacerated and punctured?

A. In that area, yes."

¶ 19    Dr. Schwartz subsequently performed a thoracotomy, in which he opened plaintiff's chest and sewed up the tear in her esophagus.

¶ 20    Dr. Yapp was shown plaintiff's Exhibit 25, which he identified as an esophageal overtube, a piece of equipment that can be used during an endoscopy. An overtube has a number of uses, including to protect a patient's airway during the removal of a foreign object, and protecting the mucosal lining of the esophagus. The standard diameter of the overtube is 1.67

centimeters. The overtube has a flexible distal tip that allows for "stable passage into the patient." Plaintiff was permitted to publish the sample overtube to the jurors so that they could see it and touch it.

¶ 21    Plaintiff questioned Dr. Yapp as to whether he agreed that the flexible distal tip of the overtube would allow objects larger than 1.67 centimeters (such as the flipper) to be pulled inside the overtube. Dr. Yapp disagreed, stating that it would have been "dangerous" to try to pull the flipper into the distal tip of the overtube. After seeing the size of the flipper, which was measured at 2.0 by 1.7 by 0.3 centimeters, Dr. Yapp determined that the flipper would not fit inside a standard overtube. Dr. Yapp decided that pulling the flipper into the latex hood was the safest way to extract it from plaintiff. Dr. Yapp noted that the latex hood was "clearly made for larger devices," such as the flipper here. Had he used the overtube, "it's possible [the flipper] could have gotten stuck and then [he] would really be in a difficult shape." In Dr. Yapp's opinion, he complied with the standard of care in his treatment of plaintiff.

¶ 22    Dr. Marc Catalano testified as plaintiff's expert in gastroenterology. Dr. Catalano was shown plaintiff's Exhibit 25, which was an overtube that can be used to help remove a foreign object from the patient's stomach. Dr. Catalano described the distal tip of the overtube as "very pliable," such that it can be torqued and stretched in multiple different directions, longitudinally and radially, allowing for the "capturing of much larger objects than can otherwise be accommodated."

¶ 23    Dr. Catalano opined that the standard of care required Dr. Yapp to use a 50-centimeter overtube to safely remove the flipper from inside plaintiff's stomach. Dr. Catalano explained that the only thing that can protect the esophagus from a large, sharp edged object such as the flipper is an overtube "that would encircle the entire esophagus."

¶ 24    Dr. Catalano was shown plaintiff's Exhibit 20, which was the exemplar flipper[2]. The exemplar contained two teeth, a molar and a premolar, with two metal protruding wires, one more curved than the other. The exemplar was longer than the actual flipper swallowed by plaintiff; according to Dr. Catalano, the actual flipper was 2.0 centimeters in length, whereas the exemplar was 2.3 centimeters in length. Plaintiff requested that Dr. Catalano be allowed to manually manipulate the exemplar into the distal tip of the overtube in front of the jury, so as to demonstrate that the actual flipper swallowed by plaintiff (which was smaller than the exemplar) would have also fit inside of the overtube. The trial court denied plaintiff's request, finding that the proposed demonstration, in which Dr. Catalano would use his hands to manipulate the exemplar into the distal tip of the overtube, was not allowable because it was too dissimilar to the actual circumstances faced by Dr. Yapp during the EGD he performed on plaintiff, when he utilized an endoscope (not his hands) to pull the flipper out of her stomach.

¶ 25    The court permitted Dr. Catalano to draw a diagram to aid the jury in understanding his testimony. Dr. Catalano drew the diagram of the esophagus, diaphragm and stomach and explained how the esophagus includes the lower esophageal sphincter, which is a complex muscle inside the stomach.  Dr. Catalano explained that the sharp edges of the flipper posed a danger of perforating the esophagus during its removal, especially because the surgeon's vision during the endoscopy is limited and because the esophagus is curved, requiring some deft maneuvering by the surgeon. In Dr. Catalano's opinion, the standard of care for removing the flipper without damaging the esophagus was to pull the flipper into the distal tip of the 50-centimeter esophageal overtube, and then to extract the overtube from the body.

_____

[2] The actual flipper swallowed by plaintiff, and the exemplar flipper, were made the same way using a mold of plaintiff's mouth.

¶ 26    Plaintiff sought to question Dr. Catalano about his opinion that plaintiff suffers permanent constipation and pain caused by the thoracotomy that was performed to repair the esophageal perforation negligently caused by Dr. Yapp. The trial court refused to allow Dr. Catalano to so testify, finding that he had no reasonable basis to support his opinion regarding the cause and permanency of plaintiff's injuries.

¶ 27    Dr. Peter Kahrilas testified as an expert in gastroenterology for defendants. Dr. Kahrilas has experience removing sharp objects from patients' stomachs, including a razor blade that he removed via a latex hood fitted over the end of an endoscope. The purpose of the latex hood is to protect the lining of the esophagus from the sharp object contained within.

¶ 28    Dr. Kahrilas identified plaintiff's Exhibit 25 as an overtube. Dr. Kahrilas explained that the primary purpose of an overtube is to prevent asphyxiation from occurring during an endoscopic procedure, by allowing the doctor to remove small objects such as food particles so as to prevent them from falling into the trachea and choking the patient.

¶ 29    Dr. Kahrilas opined that Dr. Yapp's decision to remove the flipper by an endoscopy using a latex hood, as opposed to an overtube, was within the standard of care because the flipper would not have fit inside the overtube.

¶ 30    Dr. John Losurdo testified as an expert in gastroenterology and interventional endoscopy on behalf of defendants. Dr. Losurdo has removed dental appliances such as dentures and partials from patients in the past, but he had never before removed a flipper such as the one plaintiff here swallowed. Dr. Losurdo noted that the flipper was irregularly shaped and was too large and too long to be pulled into an overtube. Dr. Losurdo opined that Dr. Yapp complied with the standard of care by removing the flipper by an endoscopy using a latex hood, as opposed to an overtube.

¶ 31    Following all the evidence, the jury returned a verdict in favor of defendants. Plaintiff filed a posttrial motion, arguing that the trial court erred by: (1) refusing her request to have her expert, Dr. Catalano, demonstrate to the jury that the exemplar would fit inside of the distal tip of the overtube; and (2) precluding Dr. Catalano from testifying that plaintiff's bowel issues and pain complaints were permanent and could have been caused by the thoracotomy procedure necessitated by Dr. Yapp's negligence. The trial court denied plaintiff's posttrial motion. Plaintiff appeals.

¶ 32                                    III. Analysis

¶ 33    First, plaintiff argues that the trial court erred in denying her posttrial motion for a new trial based on the court's refusal to allow Dr. Catalano to demonstrate to the jury that he could manually fit the exemplar into the distal tip of the overtube. We review the denial of plaintiff's posttrial motion for an abuse of discretion. *Stamp v. Sylvan*, 391 Ill. App. 3d 117, 123 (2009). The court's decision as to whether or not to allow a courtroom demonstration is also reviewed for an abuse of discretion. *People v. Oliver*, 306 Ill. App. 3d 59, 73 (1999).

¶ 34    "In deciding whether the trial court abused its discretion reviewing courts look 'primarily to whether the demonstration is probative of facts in issue and whether it is conducted under substantially similar conditions and circumstances as those which surrounded the original occurrence.'" *Id.* at 73-74 (quoting *People v. Harp*, 193 Ill. App. 3d 838, 843 (1990)).

¶ 35    The trial court here found that the proposed courtroom demonstration by Dr. Catalano was not substantially similar to the conditions and circumstances surrounding the EGD performed by Dr. Yapp on plaintiff. In denying plaintiff's posttrial motion, the trial court elaborated on its findings:

"Plaintiff prepared a video of a retrieval of an exemplar device using an overtube, which was shown, to the court and parties, outside the presence of the jury. In the video, the demonstration retrieval of an exemplar flipper using an overtube procedure was carried out horizontally, on a flat table, and the exemplar was manually drawn towards the overtube. No one was viewing the retrieval through an endoscope, the exemplar was not inside an actual person's stomach, and the individual was demonstrating the retrieval while standing next to the table with the exemplar and device lying flat on the table.

Dr. Catalano, himself, demonstrated to the court what he intended to demonstrate to the jury, without the video. The court had to remind Dr. Catalano more than once, to refrain from pushing the exemplar flipper into the distal port of the overtube with his fingers. *** This was because Dr. Catalano, by using his fingers, was in effect applying force to secure the exemplar in the overtube. This type of force to the flipper would and could not be used in the actual procedure, since the physician's hand would not be in the patient's stomach. There was no showing that the amount of force generated by a person pushing the exemplar into the distal end of the overtube could be duplicated by a person manipulating equipment inside an endoscope, inside a person under sedation, and possibly with limited ability to generate force, and limited visibility.

The overall effect of the demonstration by Dr. Catalano was, in this court's opinion, to make the retrieval using the overtube, look deceptively easy. The demonstration by Dr. Catalano was not at all similar to the actual circumstance encountered by Dr. Yapp, while he was manipulating the endoscope and retrieval equipment including a hood located inside a patient's throat and stomach, with restricted visibility."

¶ 36    The court noted that it had allowed Dr. Catalano to "discuss his theory of the case and to draw diagrams before the jury that illustrated his theory of using an overtube to retrieve the flipper swallowed by [plaintiff]." The exemplar and the overtube were shown to the jury, as visual aids, during Dr. Catalano's testimony. However, the court found that "[t]he demonstration retrieval using an overtube and an exemplar was properly banned *** since it did not meet the 'substantially similar' requirement ***. Exclusion of this demonstration does not warrant granting plaintiff's motion for a new trial."

¶ 37    The trial court was correct in finding that Dr. Catalano's proposed demonstration was not substantially similar to Dr. Yapp's actual procedure performed on plaintiff, where: Dr. Yapp utilized an endoscope to withdraw the flipper into a latex hood and out her mouth, while Dr. Catalano planned to force the exemplar into the distal tip of the overtube with his hands instead of with an endoscope; Dr. Yapp withdrew the flipper from plaintiff's stomach past the esophageal sphincter, where the esophagus made a significant turn, while Dr. Catalano's demonstration would take place on a flat table outside of an actual person's stomach; and Dr. Yapp had limited visibility due to the placement of the flipper inside plaintiff's stomach, whereas Dr. Catalano would face no similar visibility restrictions during his demonstration. Accordingly, the trial court committed no abuse of discretion in refusing to allow Dr. Catalano's courtroom demonstration, and in denying plaintiff's posttrial motion.

¶ 38    Plaintiff also argues that, even if Dr. Catalano's demonstration was properly excluded, the trial court abused its discretion by failing to allow Dr. Catalano to testify to the diameter of the distal tip of the overtube. Plaintiff argues that such testimony would have informed the jury that the flipper could have fit inside the distal tip and would have supported her theory that Dr.

Yapp was negligent for failing to utilize an overtube when retrieving the flipper from her stomach.

¶ 39     Review of the record belies plaintiff's argument, as Dr. Catalano specifically testified that the diameter of the overtube is two centimeters and that the distal tip "expands to two, two-and-a-half centimeters or more," and can "accommodate objects that are twice the size" of the tip. Thus, Dr. Catalano was not precluded from testifying to plaintiff's theory of the case; he was, however, precluded from giving a demonstration under circumstances that were not substantially similar to the circumstances faced by Dr. Yapp when he performed the EGD on plaintiff. As discussed, the trial court committed no abuse of discretion in so preventing such a dissimilar demonstration from being performed in front of the jury.

¶ 40     Next, plaintiff argues that the trial court erred in denying her posttrial motion for a new trial based on the court's refusal to allow Dr. Catalano to give his opinion that plaintiff's constipation and pain around her surgical site was permanent and could have resulted from the thoracotomy procedure that was performed to repair the esophageal perforation negligently caused by Dr. Yapp. To lay an adequate foundation for expert testimony, plaintiff must establish that the witness qualifies as an expert "by knowledge, skill, experience, training, or education." Ill. R. Evid. 702 (eff. Jan. 1, 2011). Plaintiff must also establish that the information on which the expert bases his opinion is reliable. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 115. The information is reliable if "it is 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Id.* (quoting Ill. R. Evid. 703 (eff. Jan. 1, 2011)).

¶ 41     In the present case, the trial court found such reliability lacking in Dr. Catalano's opinions about the cause and permanency of plaintiff's injuries. The court noted that

Dr. Catalano is not a cardiothoracic surgeon and does not perform thoracotomies; instead, he is a gastroenterologist. Dr. Catalano had a one-hour phone conversation with plaintiff the day before his deposition, reviewed Dr. Yapp's two depositions and Dr. Schwartz's deposition, and examined plaintiff's medical records prior to formulating his opinions. None of the deposition testimony or medical records indicated that plaintiff's continuing pain and constipation were definitively caused by the thoracotomy performed on her more than five years ago or that they were permanent. Further, Dr. Catalano never examined plaintiff, never viewed her surgical scar, and never consulted with her treating physicians. In fact, no treating physician had examined plaintiff for more than two years prior to trial, meaning that no recent medical information about her constipation and pain around the surgical site was even available.

¶ 42    The trial court found that without any expertise in performing thoracotomies, and without performing an examination of plaintiff, or reviewing a medical record of a recent examination, Dr. Catalano lacked information reasonably relied on by experts in the field to form an opinion about whether the thoracotomy caused plaintiff's continuing constipation and pain and whether such conditions were permanent. The trial court committed no abuse of discretion in so finding, and in barring Dr. Catalano from testifying about the causation and permanency of plaintiff's injuries.

¶ 43    Plaintiff argues, though, that Dr. Catalano would have testified that plaintiff's continuing constipation and pain *could* or *might* have been caused by the thoracotomy, which meets the "might or could" standard set forth in *Mesick v. Johnson*, 141 Ill. App. 3d 195 (1986), *Geers v. Brichta*, 248 Ill. App. 3d 398 (1993), and *Iaccino v. Anderson*, 406 Ill. App. 3d 397 (2010). In *Mesick*, *Geers*, and *Iaccino*, the appellate court held that "a physician may testify to what might

or could have caused an injury despite any objection that the testimony is inconclusive." *Mesick* 141 Ill. App. 3d at 205-06; *Geers*, 248 Ill. App. 3d at 407; *Iaccino* 406 Ill. App. 3d at 407.

¶ 44 However, a physician may testify to what might or could have caused an injury only so long as the facts upon which he bases his opinion are of a type reasonably relied on by experts in the particular field. *Iaccino*, 406 Ill. App. 3d at 407. In *Mesick* and *Geers*, the physicians' causation testimony was based on their examinations of the respective plaintiffs (see *Mesick*, 141 Ill. App. 3d at 206; *Geers*, 248 Ill. App. 3d at 408); in *Iaccino*, the physician's causation testimony was based on his review of recent placental slides and medical records, which the appellate court deemed were sources of information reasonably relied on by pediatric pathologists to support their medical opinions. *Iaccino*, 406 Ill. App. 3d at 407. By contrast, in the present case, Dr. Catalano never examined plaintiff nor reviewed any recent medical records concerning her constipation and pain, and thus the trial court committed no abuse of discretion in finding that Dr. Catalano had no reliable basis for his causation opinion, and in barring his causation testimony.

¶ 45 For all the foregoing reasons, we affirm the circuit court.

¶ 46 Affirmed.