2022 IL App (1st) 220277-U

No. 1-22-0277

Order filed December 2, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| THE VILLAGE OF NORTHBROOK, | ) |
| | ) Appeal from the |
| Plaintiff-Appellant, | ) Circuit Court of |
| | ) Cook County. |
| v. | ) |
| | ) No. 18 CH 14762 |
| THE BOARD OF TRUSTEES OF THE VILLAGE OF | ) |
| NORTHBROOK FIREFIGHTER PENSION FUND and | ) Honorable |
| RICHARD EDWARD MARTIN, | ) Caroline Kate Moreland, |
| | ) Judge, presiding. |
| Defendants-Appellees. | ) |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice McBride and Justice Gordon concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's order upholding the pension board's decision to award line-of-duty disability pension benefits to a firefighter over the village's contentions that the pension board lacked jurisdiction to award such benefits, that the pension board's decision was against the manifest weight of the evidence, and that the pension board did not apply the preponderance of the evidence standard to the issue of causation.

¶ 2    Plaintiff, the Village of Northbrook (the Village), appeals from a judgment of the circuit court of Cook County upholding the Board of Trustees of the Village of Northbrook Firefighter Pension Fund's (the Pension Board) decision to award former Northbrook fire captain Richard Martin a line-of-duty disability pension pursuant to section 4-110 of the Illinois Pension Code (the Code) (40 ILCS 5/4-110 (West 2016)). Martin's pension is based on his permanently disabling cardiomyopathy, which is a weakening of the heart muscle that diminishes the heart's ability to pump blood.[1] The Village challenges (1) the Pension Board's jurisdiction to award Martin line-of-duty disability benefits after it awarded him interim nonduty disability benefits, (2) the sufficiency of the evidence supporting the Pension Board's decision to grant line-of-duty disability benefits, and (3) the Pension Board's application of the preponderance of the evidence standard to the issue of causation. For the reasons stated below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    The parties agree that Martin suffers from several chronic heart conditions, including cardiomyopathy. They also agree that Martin is permanently disabled and can no longer perform his duties due to cardiomyopathy. The only factual dispute is whether Martin's acts of duty, specifically his participation in November 2015 training exercises, were causative factors in aggravating his cardiomyopathy to the point of permanent disability. We will first review the undisputed facts regarding Martin's employment history, medical history, and the November 2015 training exercises. Then we will review the disputed medical evidence of causation. We take these

_____

[1] Explanations of medical terms are taken from the testimony of the doctors before the Pension Board in this matter.

facts from the testimony and exhibits that were before the Pension Board and that are in the record on appeal.

¶ 5                          A. Martin's Employment and Medical History

¶ 6      As a child, Martin suffered from coarctation, or narrowing, of the aorta, which was repaired by surgery in the 1970s. Martin also has a left bundle branch block, which is a defect in the electrical system that controls the heart's pumping action, and which most likely developed before he became a firefighter. The Village hired Martin as a firefighter in 1996. In 2005, Martin was diagnosed with cardiomyopathy. Cardiomyopathy causes a lower-than-normal ejection fraction, which is the percentage of blood that leaves the heart each time it pumps. A normal ejection fraction is approximately 50% to 55% or higher. From 2007 to 2015, Martin's ejection fraction was within the lower limits of the normal range, between 45% and 48%. He was promoted to fire captain in 2013.

¶ 7      Martin attended training exercises in Champaign, Illinois from November 9 to 13, 2015. This training was an official assignment approved by the fire chief and Martin was on duty during the week of training. Portions of the training were physically intense and involved extinguishing live fires, climbing stairs, moving fire hoses, and clearing out burned rooms, all while wearing firefighting equipment. Two days before training began, Martin experienced allergy or cold-like symptoms, and he became increasingly fatigued throughout the week of training. By the fourth day of training, November 12, 2015, Martin developed a fever and had difficulty breathing and an irregular pulse. That day, he sought treatment at a local clinic and was diagnosed with pneumonia.

¶ 8      On November 17, 2015, Martin's treating cardiologist measured his ejection fraction at 36%. He ceased active duty as a firefighter on December 21, 2015. On December 23, 2015,

Martin's cardiologist measured his ejection fraction at 10% and diagnosed him with heart failure. Martin's ejection fraction was 20% in February 2016. He received a surgically implanted defibrillator in September 2016. By January 2017, Martin's ejection fraction had improved to 40% and his heart failure specialist, Dr. Ali Valika, cleared him to return to work. However, in March 2017, the Village decided not to return Martin to his position as a fire captain due to concerns about him becoming suddenly incapacitated while on duty.

¶ 9     In July 2017, Martin filed an application with the Pension Board seeking either a line-of-duty disability pension pursuant to section 4-110 of the Code (40 ILCS 5/4-110 (West 2016)) or an occupational disease disability pension pursuant to section 4-110.1 (40 ILCS 5/4-110.1 (West 2016)).[2] In October 2018, the Pension Board awarded Martin a section 4-110 line-of-duty disability pension. The Village was not a party to those proceedings because the Pension Board denied the Village's motion to intervene. The Village challenged the Pension Board's denial of its motion to intervene in an administrative review proceeding before the circuit court. The circuit court remanded the matter to the Pension Board for a new administrative hearing with the Village's participation, which led to the proceedings at issue in this appeal.

¶ 10     On April 3, 2020, the Pension Board terminated the line-of-duty pension it awarded Martin in October 2018 due to the need for a new hearing on remand. However, at his request and over the Village's objection, the Pension Board granted Martin nonduty disability benefits under section 4-111 (40 ILCS 5/4-111 (West 2016)), on an interim basis and "without prejudice to [his] pending application for a line of duty *** benefit." The Village agreed that Martin was eligible for a

---

[2] The Pension Board found that Martin's application for an occupational disease disability pension was moot when it decided to award a line-of-duty disability pension, so occupational disease disability benefits are not at issue in this appeal.

nonduty disability pension but argued that the Code did not authorize the Pension Board to grant such benefits on an interim basis. The Pension Board continued the matter for further investigation, disclosure of witnesses, and evidentiary hearings.

¶ 11                                    B. Medical Evidence of Causation

¶ 12     During evidentiary hearings in the summer of 2020, the Pension Board received the reports and testimony of five doctors.[3] Martin called his regular cardiologist, Dr. Ali Valika, and the Village called Dr. Peter Santucci as a retained expert. Three doctors served as the Pension Board's independent medical examiners (IMEs): Dr. Joseph Cytron, Dr. Nishant Verma, and Dr. Pratik Patel.[4]

¶ 13     Dr. Valika is board-certified in cardiology and heart failure. He has been treating Martin since 2016. Dr. Valika concluded that Martin was permanently disabled and unable to perform his duties as a firefighter due to cardiomyopathy. The physical stress of Martin's work as a firefighter and exposure to smoke or fumes could have exacerbated his underlying cardiomyopathy. Other possible causes of Martin's worsened cardiomyopathy included high blood pressure, his prior coarctation and left bundle branch block, and a viral infection. Dr. Valika could not conclusively identify what caused the aggravation of Martin's cardiomyopathy in late 2015, but he could not

---

[3] In administrative proceedings, the Rules of Evidence are relaxed, and medical reports are normally admitted into evidence without the required foundation. See *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 79 ("the strict rules of evidence that apply in a judicial proceeding are not applicable to proceedings before an administrative agency")

[4] Section 4-112 of the Code requires that a firefighter's disability be established "by the board by examinations of the firefighter at pension fund expense by 3 physicians selected by the board and such other evidence as the board deems necessary." 40 ILCS 5/4-112 (West 2016). However, "[t]he 3 physicians selected by the board need not agree as to the existence of any disability or the nature and extent of a disability." 40 ILCS 5/4-112 (West 2016).

"exclude the possibility that stress-related activities with fire suppression and firefighting duties would exacerbate his underlying heart failure."

¶ 14    The Village's retained expert, Dr. Santucci, is a cardiologist and electrophysiologist. Dr. Santucci opined that a viral infection, in combination with the preexisting left bundle branch block, was the most likely cause of the deterioration of Martin's heart condition in late 2015. Viral infections that cause heart dysfunction typically begin as "some sort of flu or pneumonia," and the fever that Martin experienced during training was "a big clue to it being an infection." The physical exertion of the training exercises made the symptoms of cardiomyopathy, such as shortness of breath, more apparent, but the training did not exacerbate Martin's cardiomyopathy itself. While Dr. Santucci could not completely exclude the training exercise as having contributed to Martin's condition, he did not "see any evidence or probability for" that scenario. Dr. Santucci concluded that it was unlikely that Martin's duties as a firefighter caused or exacerbated his heart conditions.

¶ 15    Dr. Cytron is a professor of medicine specializing in cardiology and electrophysiology. Dr. Cytron opined that "probability strongly favor[ed]" Martin's left bundle branch block as the cause of his worsened cardiomyopathy, because Martin's heart function improved after he received a defibrillator in 2016. The defibrillator's purpose was to correct the left bundle branch block. Other potential causes included "strong emotional stress" and, least likely, viral myocarditis. Dr. Cytron could not exclude the possibility that the stress of Martin's duties and the training exercises exacerbated his cardiomyopathy, but he described that scenario as "unlikely." However, "the time course support[ed]" the possibility that the training exercise aggravated Martin's cardiomyopathy because his ejection fraction was 45% prior to the training and then declined significantly between mid-November and late December 2015. Dr. Cytron opined that Martin's "progressive decline

over time *** was just a coincidence of the timing of this training that caused him to become aware of the limitations" his heart condition. That is, Martin and his doctors realized the extent of his cardiomyopathy in late 2015 because the training "pushed the system beyond its capacity."

¶ 16    Dr. Verma is a cardiac electrophysiologist specializing in abnormal heart rhythms. Dr. Verma could not conclusively identify the cause of the aggravation of Martin's cardiomyopathy in late 2015, but "the preexisting cardiac conditions are the most likely proximate cause." Other possible causes included a viral infection and work exposures. Dr. Verma could not rule out as contributing causes Martin's duties as a firefighter, such as responding to fires in late 2015 and the November 2015 training exercises.

¶ 17    Dr. Patel is board certified in internal medicine, cardiology, and electrophysiology. He opined that a viral infection was the most likely cause of the exacerbation of Martin's cardiomyopathy. It was unlikely that the physical stress of the training exercises or Martin's duties as a firefighter contributed to his decreased ejection fraction, even in combination with a viral infection. However, Dr. Patel could not completely rule out Martin's work as a firefighter and the training as contributing to the decline in his ejection fraction.

¶ 18         C. The Pension Board's Decision and Administrative Review Proceedings

¶ 19    The Pension Board issued its written final administrative decision, in which it granted Martin a section 4-110 line-of-duty disability pension. The Board found that it had the power to award line-of-duty benefits after granting interim nonduty benefits because the award of nonduty benefits was not a final administrative ruling. The Pension Board also explained that there was no dispute that Martin was permanently disabled and concluded that the November 2015 training exercises exacerbated his heart condition. The Pension Board gave the most weight to Dr. Valika's

testimony because he was the only heart failure specialist to testify, and Drs. Verma and Patel agreed that a heart failure specialist would be best qualified to opine on causation. The Pension Board gave the second most weight to Dr. Santucci's testimony, and the third most weight to the IMEs' testimony. In reaching its conclusion, the Pension Board relied on Dr. Valika's opinion that heighted physical stress, like the kind that firefighters experience, can exacerbate cardiomyopathy. The Board also noted that Dr. Valika testified that he would advise a patient with a 36% ejection fraction to avoid intense exercise. Based on the doctors' combined testimony, the Pension Board found that the left bundle branch block, high blood pressure, coronary artery disease, coarctation, and viral myocarditis probably did not cause Martin's acute decline in heart function in late 2015.

¶ 20    The Village filed a petition for administrative review, the circuit court affirmed the Pension Board's decision, and the Village timely appealed.

¶ 21                                   II. ANALYSIS

¶ 22    On appeal, the Village challenges the Pension Board's decision to grant Martin a section 4-110 line-of-duty disability pension on three grounds. First, the Village contends that the Pension Board lacked jurisdiction to grant such benefits after it awarded Martin section 4-111 nonduty pension benefits on an interim basis, because the grant of nonduty benefits was a final decision that terminated the Board's jurisdiction over the case. Second, the Village argues that the evidence did not support the Pension Board's grant of line-of-duty disability benefits. Finally, the Village contends that the Pension Board did not apply the preponderance of the evidence standard to the issue of causation.

¶ 23    The Administrative Review Law governs an appeal from an administrative hearing. 40 ILCS 5/4-139 (West 2016); *Scepurek v. Board of Trustees of Northbrook Firefighters' Pension*

*Fund*, 2014 IL App (1st) 131066, ¶ 17. On appeal, we review the decision of the pension board, not the decision of the circuit court. *Scepurek*, 2014 IL App (1st) 131066, ¶ 17. The applicable standard of review depends upon whether the appeal raises a question of law or fact. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). We review questions of law *de novo*, meaning that we undertake an independent review and do not give deference to the pension board's conclusions. *Id.* By contrast, when reviewing a question of fact, we presume that the pension board's factual findings and credibility determinations are *prima facie* correct, and we will only reverse if the factual findings are against the manifest weight of the evidence. *Id.* Mixed questions of law and fact are subject to a clearly erroneous standard of review, meaning that we will only reverse if we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotations omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392-95 (2001).

¶ 24 The Code provides for different pensions depending on the type of permanent disability at issue. Under section 4-111, a firefighter may receive a nonduty disability pension if he has "at least 7 years of creditable service" and becomes permanently "disabled as a result of any cause other than an act of duty." 40 ILCS 5/4-111 (West 2016). A nonduty disability pension provides 50% of the firefighter's monthly salary at his most recent rank. 40 ILCS 5/4-111 (West 2016). Under section 4-110, a firefighter may receive a line-of-duty disability pension if he, "as the result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of duty is found *** to be physically or mentally permanently disabled for service in the fire department." 40 ILCS 5/4-110 (West 2016). A line-of-duty disability pension provides 65% of the firefighter's monthly salary at his most recent rank. 40 ILCS 5/4-110 (West

2016). An "act of duty" is "[a]ny act imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2016).

¶ 25                                  A. The Pension Board's Jurisdiction

¶ 26    The Village first argues that the Pension Board's April 2020 order granting Martin interim nonduty disability benefits under section 4-111 was, in fact, a final decision on his pension application. According to the Village, Martin's Pension Board case terminated 35 days after the issuance of that order because no party challenged the award of nonduty disability benefits, so the Pension Board lost jurisdiction of the case at that point and had no authority to later grant Martin line-of-duty disability benefits under section 4-110. The Pension Board's jurisdiction is a question of law, so we review it *de novo*. See *Village of Hanover Park v. Board of Trustees of Village of Hanover Park Police Pension Fund*, 2021 IL App (2d) 200380, ¶ 48.

¶ 27    A pension board loses jurisdiction over a matter when it makes a final administrative decision and 35 days elapse without further proceedings, such as a petition for administrative review in the circuit court. *Id.* ¶ 49. A final administrative decision is "any decision, order or determination of any agency rendered in a particular case, which affects the legal rights, duties or privileges of parties and which *terminates the proceedings* before the administrative agency." (Emphasis added.) 735 ILCS 5/3-101 (West 2016). A final administrative decision follows "some sort of adversarial process involving the parties affected, where a hearing on controverted facts is held, and ultimately a disposition is rendered by an impartial [fact finder]." (Internal quotations

omitted.) *Jagielnik v. Board of Trustees of Police Pension Fund of Village of Mundelein*, 211 Ill. App. 3d 26, 32 (1991).

¶ 28    We find that the Pension Board's order granting Martin interim nonduty pension benefits under section 4-111 was not a final administrative decision. Although that order affected the legal duties and privileges of the parties in that it required the Village to pay Martin 50% of his salary, it did not "terminate[ ] the proceedings before the administrative agency." See 735 ILCS 5/3-101 (West 2016). The Pension Board characterized its decision as without prejudice to Martin's line-of-duty disability pension application, indicating that the Board intended for proceedings on Martin's application to continue, not end. The Pension Board also allowed the parties to conduct additional investigation and disclose witnesses for future evidentiary hearings. An interim ruling that contemplates further evidentiary hearings is not a final administrative decision. *Jagielnik*, 211 Ill. App. 3d at 33. So, the award of interim nonduty disability benefits did not terminate the Pension Board's jurisdiction even though no party challenged the order within 35 days. Martin's application simply continued for further evidentiary hearings and a final decision.

¶ 29    The Village cites no authority holding that a pension board's award of interim nonduty disability benefits under section 4-111, if unchallenged within 35 days, becomes a final administrative decision that deprives the pension board of jurisdiction to later award permanent line-of-duty disability benefits under section 4-110. The Pension Board's decision to award interim nonduty benefits while Martin's application was pending is not unprecedented. See, e.g., *Village of Buffalo Grove v. Board of Trustees of the Buffalo Grove Firefighters' Pension Fund*, 2020 IL App (2d) 190171, ¶ 14 (pension board awarded interim nonduty benefits to widow while her application for survivor's benefits was pending; interim benefits were not challenged on appeal).

Nor was that decision unreasonable. An award of interim benefits ensures that the applicant receives at least some income while his or her case is pending, which can take several months, as it did in this case. The cases that the Village cites are distinguishable and none of them discuss interim benefits. See, e.g., *De Jesus v. Policemen's Annuity and Benefit Fund of City of Chicago*, 2019 IL App (1st) 190486, ¶¶ 2, 9 (dismissal proper because plaintiffs waited between 9 and 20 years to challenge the calculation of their pension benefits); *Ray v. Beussink & Hickam, P.C.*, 2018 IL App (5th) 170274, ¶ 1 (pension board attempted to correct calculation error 2 years after awarding benefits); *Sola v. Roselle Police Pension Board*, 342 Ill. App. 3d 227, 232 (2003) (pension board attempted to modify benefits 8 years after granting them).

¶ 30    The Village also argues that the Pension Code does not allow for an "interim retirement pension" or "prepaying benefits." Neither of those occurred in this case. Martin's interim benefits were based on his disability, not retirement. Section 4-111 authorizes benefits based on a nonduty, permanent disability after 7 years of creditable service (40 ILCS 5/4-111 (West 2016)), which the Village agreed Martin qualified for. Nor did the Pension Board "prepay" any benefits. Martin was only paid section 4-111 benefits after the Pension Board entered its April 2020 order and, in fact, the Pension Board clawed back $750 per month to recoup the difference between Martin's October 2018 line-of-duty disability pension and the interim nonduty disability pension. Accordingly, we find that the Pension Board's award of section 4-111 nonduty disability benefits on an interim basis did not divest the Board of jurisdiction and did not prevent it from later awarding section 4-110 line-of-duty benefits pursuant to Martin's application.

¶ 31                    B. Sufficiency of the Evidence of Causation

- 12 -

¶ 32 The Village next contends that the evidence did not support the Pension Board's decision to grant Martin a line-of duty disability pension. To obtain a section 4-110 line-of-duty disability pension, a firefighter must establish that he, "as the result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of duty is *** physically or mentally permanently disabled for service in the fire department." 40 ILCS 5/4-110 (West 2016); see also *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 23 (to be eligible for a line-of-duty pension, a claimant must prove that a duty-related incident was "a causative factor contributing to the claimant's disability."). As noted above, the parties agree that Martin is permanently disabled and cannot perform his duties as a fire captain because of his cardiomyopathy. The only dispute is whether Martin's acts of duty, particularly the November 2015 training exercises, were factors contributing to his disability.

¶ 33 The parties disagree as to the standard of review applicable to this issue. The Village argues that causation is a mixed question of law and fact to which the clearly erroneous standard applies. Martin and the Pension Board maintain, and we agree, that this issue is a question of fact to which the manifest weight of the evidence standard applies. The relevant question is whether acts of duty caused or contributed to Martin's disability. See *Covello v. Village of Schaumburg Firefighters' Pension Fund*, 2018 IL App (1st) 172350, ¶ 42. The issue of on-duty causation "has been routinely found to be a question of fact subject to the manifest weight of the evidence standard of review." *Id.* (collecting cases). So, we will review the Pension Board's finding that there is a causal nexus between Martin's acts of duty and his disabling cardiomyopathy under a manifest weight of the evidence standard.[5]

---

[5] Some courts have applied the clearly erroneous standard in situations where the facts were undisputed, and the question was whether those undisputed facts met a statutory standard, such as

¶ 34    Factual findings are against the manifest weight of the evidence only if it is clear that the pension board should have reached the opposite conclusion, or if the findings are "unreasonable, arbitrary, and not based upon any of the evidence." *Lyon v. Department of Children and Family Services*, 209 Ill. 2d 264, 271 (2004). It is the pension board's function to judge the credibility of the witnesses, assign weight to the evidence, and resolve conflicts in the medical evidence. *Gatz v. Board of Trustees of Maywood Police Pension Fund*, 2019 IL App (1st) 190556, ¶ 24. Whether we would have reached the same conclusion is not the test of whether the Board's decision is against the manifest weight of the evidence. *Id.* A pension board's decision should be affirmed if there is some evidence to support its conclusion. *Village of Stickney v. Board of Trustees of the Police Pension Fund*, 363 Ill. App. 3d 58, 66 (2005).

¶ 35    To determine whether the Pension Board's decision was against the manifest weight of the evidence, we must examine the evidence of Martin's disability. See *Scepurek*, 2014 IL App (1st) 131066, ¶ 27. A disability may result from multiple causes, and an applicant need not prove that a duty-related incident is the sole cause, or even the primary cause, of his disability. *Id.* Rather, an applicant must only prove that the duty-related injury is " 'a causative factor contributing to the claimant's disability.' " *Id.* (quoting *Luchesi v. Retirement Board of Firemen's Annuity and Benefit Fund of Chicago*, 333 Ill. App. 3d 543, 550 (2002)). Moreover, "a disability pension may be based upon the line-of-duty aggravation of a preexisting condition." *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 505 (2007). " 'There is no requirement that the duty-related

---

whether a certain activity qualified as an act of duty under the Code. See, e.g., *Howe v. Retirement Board of Firemen's Annuity and Benefit Fund of Chicago*, 2015 IL App (1st) 141350, ¶ 47. But in this case, the five doctors each presented different medical scenarios explaining what caused Martin's cardiomyopathy to suddenly worsen in late 2015. The Pension Board's task was to decide which of those scenarios was the most plausible. That is a factual determination, and we see no question of law entangled with it. So, this issue is not a mixed question of law and fact to which the clearly erroneous standard would apply.

incident be the originating or primary cause of injury, although a sufficient nexus between the injury and the performance of the duty must exist.' " *Id.* (quoting *Barber v. Board of Trustees of Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 818 (1993) (abrogated on other grounds by *Kouzoukas v. Retirement Board of Policemen's Annuity and Benefit Fund of Chicago*, 234 Ill. 2d 446 (2009)).

¶ 36    The Pension Board determined that Martin's participation in the November 2015 training exercises was a factor that aggravated his cardiomyopathy. The timeline of Martin's medical history provided evidence in support of the Pension Board's finding. Between 2007 and 2015, Martin's ejection fraction was in the low-normal range at approximately 45% to 48% and he performed his duties without incident during that time. Within four days of the November 2015 training exercises, Martin's ejection fraction dropped to 36%. By December 23, 2015, Martin's ejection fraction had declined to 10%. In January 2016, Martin's ejection fraction was 13% and in February 2016 it was still only 20%. This timeline suggests that events in mid-November 2015 caused Martin's ejection fraction, which is a manifestation of cardiomyopathy, to suddenly decline to disabling levels. According to Dr. Cytron, it was clear that "something significantly changed between November and late December 2015." Dr. Verma agreed that Martin experienced a significant decrease in ejection fraction in November 2015.

¶ 37    The key question is what caused this significant decline in Martin's ejection. None of the testifying doctors conclusively identified a single cause, but heart failure specialist Dr. Valika pointed to the physical stress of Martin's work as a potential aggravating factor. He explained that elevated physical stress and exposure to smoke and fumes, like what firefighters experience on the job, can exacerbate cardiomyopathy. Moreover, the effects of physical stress on Martin's heart

could have occurred in conjunction with a viral infection and, if they did, that could result in a worse outcome of the infection. Dr. Verma also acknowledged that both the training exercises and Martin working as a firefighter through late 2015 may have contributed to his disabling heart condition. Based on this timeline and the doctors' testimony, it was reasonable for the Pension Board to conclude that Martin's duties in mid-November 2015, including the training exercises, exacerbated his cardiomyopathy to a disabling level. We cannot say that the Pension Board's findings as to causation are unreasonable, arbitrary, or not based upon any of the evidence. Nor can we say that the Pension Board clearly should have reached the opposite conclusion, *i.e.*, that the November 2015 training exercises had no effect on the condition of Martin's heart.

¶ 38    The Village argues that "overwhelming medical evidence" makes it "clear that Martin's heart problems were not related to training or firefighting activities." That is an overstatement. All the doctors testified that they could not identify a single cause of the late 2015 decline in Martin's heart function. The doctors discussed causation in terms of likelihood, rather than certainty, and they did not even agree about the most likely cause of Martin's disabling cardiomyopathy. There is nothing "overwhelming" about the medical evidence of causation in this case, and the evidence certainly did not make it "clear" that Martin's worsened heart condition in late 2015 was entirely unrelated to his duties.

¶ 39    The Village also argues that Dr. Valika merely "speculat[ed]" that it was possible that Martin's duties aggravated his cardiomyopathy; he did not opine that such a causal connection was probable. However, physicians "may testify to what *might or could* have caused an injury despite any objection that the testimony is inconclusive," so long as their opinions are based on reliable sources of information such as examination of the patient or his medical records. (Emphasis

added.) *Ackerman v. Yapp*, 2020 IL App (1st) 182708, ¶ 43 (citing *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 407 (2010)). As Martin's treating heart failure specialist, Dr. Valika examined Martin and prepared his medical records, so his testimony as to possible causes of Martin's condition was proper and is sufficient for us to uphold the Pension Board's findings under a manifest weight of the evidence standard. Most importantly, none of the doctors conclusively *excluded* Martin's duties as a firefighter and participation in the training exercises as having exacerbated his cardiomyopathy. So, while Dr. Valika discussed on-duty causation in terms of possibility, none of the other doctors ruled out the possibility that acts of duty were, in fact, a causative factor.

¶ 40    In addition, the Village contends that the Pension Board violated section 4-112 by outright rejecting the opinions of all three IMEs. That is an overstatement as well. The Board's decision relied on the testimony of Drs. Cytron and Patel in ruling out viral myocarditis and Martin's coarctation as aggravating factors. In any event, section 4-112 "requires neither a concurrence of the three [IMEs] that a firefighter is disabled, nor does it even require an opinion of one physician, let alone a concurrence of all three, that his disability is duty-related." *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 369 (2005). When testifying physicians disagree as to causation, as they did in this case, the pension board is not required to accept the majority view. See *id.* at 372. All section 4-112 requires is that three IMEs examine the firefighter and report their findings to the board (*id.* at 369); the pension board retains the ultimate decision regarding disability and causation (*Wade*, 226 Ill. 2d at 514). Accordingly, we find that the Pension Board's decision to grant Martin a section 4-110 line-of-duty disability pension was not against the manifest weight of the evidence.

¶ 41          C. Pension Board's Application of Preponderance of the Evidence Standard

¶ 42     Finally, the Village argues that the Pension Board did not apply the preponderance of the evidence standard to the issue of causation. The Village points to the Pension Board's written decision, which stated that a preponderance of the evidence supported its finding that Martin was permanently disabled and unable to perform his duties but omitted that language when discussing causation. The Village also notes that, before the circuit court, the Pension Board argued that "some evidence" supported its finding of causation and contended that "courts have upheld a factfinder's conclusions even where there is less than a one percent chance that an action caused an injury." The Village implies that this was a tacit admission that Martin did not prove causation by a preponderance of the evidence.

¶ 43     The Village is correct that a plaintiff in an administrative hearing bears the burden of proof by a preponderance of the evidence. 5 ILCS 100/10-15 (West 2016); *Slocum v. Board of Trustees of State Universities Retirement System*, 2013 IL App (4th) 130182, ¶ 26; see also *Olson v. Lombard Police Pension Fund*, 2020 IL App (2d) 190113, ¶ 1 (board applied preponderance standard to evidence of on-duty causation of disability). However, we have found no authority holding that we can review whether the Pension Board applied a preponderance of the evidence standard to the issue of causation and, if it did not, reverse and remand on that basis. The Village cites no such authority, and its opening brief acknowledges that "this [C]ourt may not have the discretion to fully reverse the Pension Board decision based on this oversight." To grant the relief that the Village seeks, we would have to hold that the Pension Board's factual findings as to causation were not against the manifest weight of the evidence, yet reverse based on a concern that Martin did not prove causation by a preponderance of the evidence. That is, we would have to opine on what the preponderance of the evidence before the Pension Board did and did not

establish, which would be tantamount to *de novo* review of factual questions. This approach would undermine the manifest weight of the evidence standard to which we are bound on appellate review. Accordingly, we affirm the circuit court's judgment upholding the Pension Board's decision to grant Martin a section 4-110 disability pension.

¶ 44                                   III. CONCLUSION

¶ 45    For the foregoing reasons, we affirm the judgment of the circuit court upholding the Pension Board's award of a line-of-duty disability pension under section 4-110 of the Code.

¶ 46    Affirmed.